UNITED STATES, Appellee,

v.

Stephen J. SCHAP, Sergeant,
U.S. Army, Appellant.

No. 96–1058.
Crim.App. No. 9400529.

U.S. Court of Appeals for
the Armed Forces.

Argued Oct. 17, 1997.

Decided Sept. 30, 1998.

318

For Appellant: *William E. Cassara* (argued); *Dan R. Hyatt* and *Major Leslie A. Nepper* (on brief); *Colonel John T. Phelps II, Lieutenant Colonel Michael L. Walters, Major J. Frank Burnette,* and *Major Holly S.G. Coffey.*

For Appellee: *Captain Elizabeth N. Porras* (argued); *Lieutenant Colonel Eva M. Novak* (on brief); *Colonel John M. Smith, Lieutenant Colonel Frederic L. Borch III,* and *Captain Joanne P. Tetreault.*

*Amicus Curiae Urging Reversal:* Ms. *Erin McAuliffe* (law student) (argued); *David Schlueter,* and *Mr. Jeff Rosier* and *Mr. Kevin Loudon* (law students) (on brief) for St. Mary's University School of Law.

*Opinion of the Court*

COX, Chief Judge:

Appellant stands convicted [1] of the premeditated murder (and beheading) of a man who cuckolded him. Art. 118(1), Uniform Code of Military Justice, 10 USC § 918(1). Placing the severed head into an athletic bag,

---

1. His approved sentence extends to a dishonorable discharge, confinement for 45 years, total forfeitures, and reduction to the grade of Private E–1. The Court of Criminal Appeals affirmed these results. 44 MJ 512 (1996).

appellant took it to the hospital where his wife had been admitted when it was feared she might be suffering a miscarriage (of a child by the deceased). To the horror of his wife and hospital personnel, appellant burst into her room, pulled the head out of the bag, deposited it on her bedside tray table, and physically forced her to look at it.

Lurid as the facts are, the granted issues [2] are quite straightforward. Finding no errors which materially prejudiced appellant's substantial rights, we affirm. Art. 59(a), UCMJ, 10 USC § 859(a).

### Issue I

The first granted issue pertains to the correctness of portions of the military judge's instructions. Appellant contends that the judge erred in multiple respects. As no trial objections were lodged regarding instructions, appellant concedes that these alleged errors or omissions must have been of a fundamental nature, such as where the judge had a *sua sponte* duty to instruct, or where they constituted "plain error." E.g., *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *United States v. Taylor*, 26 MJ 127, 129 (CMA 1988); *United States v. Fisher*, 21 MJ 327 (CMA 1986). In particular, appellant first contends that the judge improperly placed a burden of proof upon him.

The sole charge in this case was premeditated murder. Premeditated murder is the unlawful killing of a human being with the "premeditated design to kill." Art. 118(1). Unpremeditated murder is the unlawful killing of a human being without premeditation, but with the intent "to kill or inflict great bodily harm." Art. 118(2).

At trial, the defense made no attempt to deny appellant's conduct, which indeed was witnessed both at the scene of the crime and at the hospital. He also did not deny the intentionality of his conduct or offer a lack-of-mental-responsibility defense. Para. 43b, Part IV, Manual for Courts–Martial, United States (1994 ed.); Art. 50a, UCMJ, 10 USC § 850a. Instead, the theory of his defense throughout was that he had only committed voluntary manslaughter. Voluntary manslaughter is the unlawful killing of a human being, with the intent to kill or to inflict great bodily harm, while "in the heat of sudden passion caused by adequate provocation." Art. 119(a), UCMJ, 10 USC § 919(a). Thus, a significant focus of the trial was an inquiry into the nature and history of appellant's relationship with his wife, his discovery of her infidelity, the extent and duration of his efforts to learn the identity of her paramour, his preparation for the killing and his pursuit of the paramour, and his demeanor before, during, and after the killing.

■ Unpremeditated murder is a lesser-included offense of premeditated murder, and voluntary manslaughter is a lesser-included offense of both premeditated and unpremeditated murder. The only difference between premeditated and unpremeditated murder is that in premeditated murder the Government must prove that, "at the time of the killing, the accused had a premeditated design to kill," while in unpremeditated murder the Government need only prove that, "at the time of the killing, the accused had the intent to kill or inflict great bodily harm." Para. 43b.

■ The elements the Government must prove for voluntary manslaughter are, some-

---

**2.** We granted these issues for review:

I. WHETHER INSTRUCTIONAL ERRORS DEPRIVED APPELLANT OF DUE PROCESS AND A FUNDAMENTALLY FAIR TRIAL AND CONSTITUTED, AT THE LEAST, PLAIN ERROR.

II. WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION IN REFUSING TO ALLOW THE DEFENSE PSYCHIATRIST TO TESTIFY AS TO THE BASIS FOR HIS OPINION.

III. WHETHER THE ARMY COURT OF CRIMINAL APPEALS ERRED IN FINDING THE ADMISSION OF BOOKS RELATING TO KNIVES OFFERED AS EVIDENCE OF "PLANNING ACTIVITY" HARMLESS WHERE THE SOLE ISSUE WAS WHETHER APPELLANT PREMEDITATED THIS HOMICIDE OR RATHER ACTED IN THE HEAT OF SUDDEN PASSION.

This case was argued at the University of Texas School of Law, Austin, Texas, without objection from the parties involved. *See* 38 MJ 136, 137 n. 1 (CMA 1993).

what paradoxically, identical to those of unpremeditated murder. *Compare* para. 44b(1) *with* para. 43b(2), Part IV, Manual, *supra*. The difference between the two offenses is that if, notwithstanding the accused's intentional state of mind, he kills while "in the heat of sudden passion caused by adequate provocation," what would otherwise be unpremeditated murder is mitigated to voluntary manslaughter. This latter mental state, though part of the statutory definition of the offense, is neither an element that the Government must prove nor an affirmative defense that the defense must prove. Once raised, however, the Government must disprove it beyond a reasonable doubt. *Mullaney v. Wilbur*, 421 U.S. 684, 704, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) ("[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case.").

In the instant case, the military judge instructed the members on reasonable doubt as follows:

> You may find the accused guilty of an offense only if you're convinced as to guilt by legal and competent evidence beyond reasonable doubt *as to each and every element of that offense.*

(Emphasis added.)

The judge next listed the elements of premeditated murder, particularly defining the phrase: "premeditated design to kill."

Immediately thereafter, the judge began instructing the members about the lesser-included offense of voluntary manslaughter. He stated:

> *You're advised that an issue has been raised by the evidence as to whether the accused acted in the heat of sudden passion.* "Passion" means a degree of rage, pain, or fear which prevents cool reflection. If sufficient cooling off time passes between the provocation and the time of the killing which would allow a reasonable person to regain self-control and refrain from killing, then the provocation will not reduce murder to the lesser offense of voluntary manslaughter. However, you

may consider evidence of the accused's passion in determining whether he possess [sic] sufficient mental capacity to have the premeditated design to kill. *An accused cannot be found guilty of premeditated murder if, at the time of the killing, his mind was so confused by anger, rage, or sudden resentment that he could not or did not premeditate.*

On the other hand, the fact that the accused's passion may have continued at the time of the killing does not necessarily demonstrate that he was deprived of the ability to premeditate, that he did not— and that he did not premeditate. *Thus, if you're convinced beyond reasonable doubt that sufficient cooling off time had passed between the provocation and the time of the killing which would allow a reasonable person to regain his self-control and refrain from killing, you must decide whether he in fact had the premeditated design to kill.*

(Emphasis added.)

Next, the military judge instructed the members on the offense of unpremeditated murder. Again, immediately thereafter, he continued the instructions on voluntary manslaughter:

> You're advised that the lesser offense of voluntary manslaughter in [sic] included within the crime of unpremeditated murder. Voluntary manslaughter is the unlawful killing of a human being with an intent to kill or inflict great bodily harm, done in the heat of sudden passion caused by adequate provocation. *Acts of the accused which might otherwise amount to murder constitute only the lesser offense of voluntary manslaughter, if those acts were done in the heat of sudden passion caused by adequate provocation.* Passion means a degree of anger, rage, pain, or fear which prevents cool reflection. The law recognizes that a person may be provoked to such an extent that in the heat of sudden passion, caused by adequate provocation, he strikes a fatal blow before he has had time to control himself. *A person who kills because of passion caused by adequate provocation is not guilty of murder.*

Provocation is adequate if it would cause uncontrollable passion in the mind of a reasonable person. The provocation must not be sought or induced as a [sic] excuse for killing or doing harm.

*If you're not satisfied beyond reasonable doubt that the accused is guilty of murder, but you are satisfied beyond reasonable doubt that the killing, although done in the heat of sudden passion caused by adequate provocation, was done with the intent to kill or inflict great bodily harm, you may still find the accused guilty of voluntary manslaughter.*

(Emphasis added.)

The military judge then gave an instruction distinguishing premeditated murder from unpremeditated murder. Thereafter, he listed the elements of voluntary manslaughter and explained applicable terms. Then the judge gave an instruction distinguishing voluntary manslaughter from unpremeditated murder.

Later the judge returned to presumptions and burdens, instructing:

You're further advised, first, that the accused is presumed to be innocent until his guilt is established by legal and competent evidence beyond reasonable doubt.

Second, if there's reasonable doubt as to the guilt of the accused, that doubt must be resolved in favor of the accused, and he must be acquitted.

*Third, if there's reasonable doubt as to the degree of guilt, that doubt must be resolved in favor of the lowest degree of guilt as to which there is no reasonable doubt.*

And, lastly, the burden of proof to establish the guilt of the accused beyond reasonable doubt is on the Government. *The burden never shifts to the accused to establish innocence, or to disprove the facts necessary to establish each element of the offense.*

(Emphasis added.)

■ Thus, the instructions unfolded in this manner: First, the judge explained the elements of the two relevant types of murder and their relationship with voluntary manslaughter. That is, he explained that, not-

withstanding the Government's proof of the elements of murder, if adequate provocation and passion were present, appellant could not be convicted of murder. Then the judge explained the elements and content of voluntary manslaughter itself. Finally, he explained that, if there was reasonable doubt *"as to the degree of guilt,"* appellant could only be convicted of *"the lowest degree of guilt as to which there is no reasonable doubt."* (Emphasis added.) In other words, since "heat of sudden passion caused by adequate provocation" bars a conviction of murder, a reasonable doubt as to the degree of guilt due to the presence of heat of passion precludes murder.

Though more elaborate than the penultimate sentence quoted from *Mullaney v. Wilbur, supra*, these instructions amounted to the same thing. Different language might, of course, be suggested. But the question before us is not whether the instructions can be improved upon, but whether they were so flawed as to now justify reversal, even though no objection was made at the point that improvement could readily have been implemented. *United States v. Fisher, supra.* We hold that the instructions were not so flawed. Nothing in them gives us pause for concern that the court members believed appellant had any burden whatever. Instead, we are satisfied that it was quite clear to the members that, for the Government to prevail on the murder charge, it had to disprove, beyond reasonable doubt, "heat of sudden passion caused by adequate provocation."

■ The next aspect of appellant's challenge to the instructions involves a phrase—"mental condition"—uttered several times by the military judge during instructions, again without contemporaneous objection. Appellant seems to imply that, by using this phrase, the military judge wrongfully injected into the proceedings the possibility that appellant was suffering from some sort of medically or psychologically cognizable category of disease or abnormality. To compound the matter, in appellant's view, the judge never defined this term for the court

members. We consider these assertions meritless in this context.

In isolation, the particular instruction appellant now objects to was as follows:

Now, the evidence in this case has raised an issue whether the accused had a *mental condition* and required state of mind with the [*sic*] respect to the offense of premeditated murder and its lesser included offenses. In determining this issue, you must consider all relevant facts and circumstances.

(Emphasis added.)

Of course the instruction was not given in isolation. It was included within a major segment of instruction about the distinctions in state of mind between premeditated murder and its lesser-included offenses, including "voluntary manslaughter, if it was done in the heat of sudden passion caused by adequate provocation without time for cool reflection...."

With obvious reference to our opinions such as *Ellis v. Jacob*, 26 MJ 90 (CMA 1988), and *United States v. Berri*, 33 MJ 337 (CMA 1991)(evidence of accused's impaired mental state is relevant to attack *mens rea* elements), the military judge went on to instruct:

Now, you're advised an accused because of some underlying *mental condition* may be mentally incapable of entertaining the premeditated design to kill, or the specific intent to kill, or the specific intent to kill or inflict great bodily harm. You should therefore consider, in connection with all the relevant facts and circumstances, evidence tending to show the accused may have been suffering from a *mental condition* of such consequence and degree as to deprive him of the ability to entertain the premeditated design to kill, or the specific intent to kill, or the specific intent to kill or inflict great bodily harm.

(Emphasis added.)

This latter instruction, of course, was the very embodiment of the theory upon which the entire defense case was predicated—that because of appellant's agitated state of mind as a result of his discovery of his wife's infidelity, he was so reasonably provoked and in such sudden heat of passion that he could not have premeditated murder or that, even if his acts were intentional, they were partially excusable due to his state of mind.[3] As previously indicated, ascertaining appellant's state of mind on the night of the homicide was essentially the only contested matter on the merits. In that regard, numerous witnesses, both expert and lay, were called by both sides on the very point. Nothing was more germane to this trial than appellant's "mental condition" at the time of the offense.

His posttrial effort to infuse the ordinary phrase "mental condition," in the context used by the military judge, with some exclusive technical connotation of psychosis or other formal diagnostic category, *see, e.g.*, American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.1994), must fail. In the context in which the instructions were given, nothing could have been clearer to the court members than that the judge was referring to the veritable mountain of evidence adduced regarding appellant's state of mind, his *mens rea*, and his claimed sudden heat of passion. The absence of defense counsel's objection or request for clarification corroborates the lack of confusion. We reject this aspect of appellant's challenge to the instructions.

■ Similarly, we reject appellant's attack on the judge's explanation of the difference between the affirmative defense of lack of mental responsibility—which the defense did not raise—and an attack on a mens rea element of the prosecution's affirmative case—which most assuredly was raised. *See Ellis v. Jacob* and *United States v. Berri*, both *supra; see generally* 1 W. LaFave and A. Scott, Substantive Criminal Law § 1.8(c) (1986).

---

**3.** As appellant himself argues on brief before this Court:

"There was substantial evidence that, at the time of the offense, appellant's mind was so clouded by confusion, anger and rage that he was incapable of premeditating, and that he lacked a sufficient cooling off period following the discovery of his wife's paramour that he was guilty of no offense greater than a manslaughter."

Final Brief at 27–28.

Arguing that the military judge threw out the heart of the defense case, appellant lifts from a lengthy passage the following language:

Lack of mental responsibility—that is, heat of passion defense—is not an issue in this case.

The fuller instruction, although partially repetitive of passages already quoted, was as follows:

Now, the evidence in this case has raised an issue whether the accused had a mental condition and required state of mind with the [sic] respect to the offense of premeditated murder and its lesser included offenses. In determining this issue, you must consider all relevant facts and circumstances.

Now, one of the elements of this offense—of these offenses is a requirement of premeditation and a specific intent to kill as to the charged offense, and the intent to kill or inflict great bodily [sic] as to the lesser included offenses, on which you've already been instructed.

Now, you're advised an accused because of some underlying mental condition may be mentally incapable of entertaining the premeditated design to kill, or the specific intent to kill, or the specific intent to kill or inflict great bodily harm. You should therefore consider, in connection with all the relevant facts and circumstances, evidence tending to show the accused may have been suffering from a mental condition of such consequence and degree as to deprive him of the ability to entertain the premeditated design to kill, or the specific intent to kill, or the specific intent to kill or inflict great bodily harm.

The guilt of the accused [sic] is on the Government to establish the guilt of the accused by legal and competent evidence beyond reasonable doubt; unless in light of all the evidence, you're satisfied beyond reasonable doubt that the accused, at the time of the alleged offense, was mentally capable of entertaining the premeditated design to kill, or the specific intent to kill, or the specific intent to kill or inflict great

bodily harm, you must find the accused not guilty of those offenses.

Now, this evidence was not offered to demonstrate or refute whether the accused is mentally responsible for his conduct. *Lack of mental responsibility—that is, heat of passion defense—is not an issue in this case.* What is an issue in this case is whether the Government has proved beyond reasonable doubt that the accused had the ability to entertain the premeditated design to kill, or the specific intent to kill, or the specific intent to kill or inflict great bodily harm.

In considering this issue, you may consider the evidence of the accused's mental condition before and after the alleged offense, as well as the evidence as to the accused's mental condition on the date of the alleged offense. The evidence as to the accused's mental condition before and after that date is admitted for the purpose of assisting you to determine the accused's condition on the date of the alleged offense.

(Emphasis added.)

We acknowledge that the suggestion that the "heat of passion defense" was "not an issue," taken out of context, would be erroneous. In context, though, it is quite obvious that the military judge was making the distinction between evidence offered as the affirmative defense of lack of mental responsibility and evidence offered to attack elements of the Government's affirmative case. *See* LaFave and Scott, *supra.* Given the extensive instructions elsewhere on heat of passion and voluntary manslaughter, we are certain that the members did not mistake the judge's meaning.

We also find meritless appellant's remaining criticisms of the military judge's instructions. For example, appellant complains that, at one point in the judge's extensive instructions to the members regarding the various types of evidence before them, he mistakenly indicated that a witness identified appellant as the speaker of a statement heard by the witness, when in fact, the witness did not identify the speaker. Civilian defense counsel promptly corrected the mili-

tary judge, who immediately acknowledged and corrected his mistake to the members. This illustrates the reason why parties must object in a timely fashion at trial or face the burden of overcoming plain error on appeal. The matter was corrected, and the trial moved on.

■ As it happens, the judge was giving the foregoing instruction to explain to the members that, before considering the content of a statement allegedly heard by the witness—which had indeed been offered for the inference that appellant was the speaker— the members had first to determine whether appellant was in fact the speaker. The judge went on to explain that, unless the members were first satisfied "beyond reasonable doubt" that appellant had made the statement, they were to "disregard" it completely and "give it no consideration, whatsoever."

Ironically, appellant now seeks to leverage this instruction on evidentiary mechanics into an accusation that the judge was "highlighting" negative evidence about him and not summarizing the evidence in an evenhanded manner. This particular instruction fell toward the end of a lengthy portion of the instructions in which the judge was explaining different categories of evidence, such as expert and lay witnesses and their opinions, circumstantial and direct evidence, depositions, stipulations, appellant's good-military-

character evidence, as well as the statement potentially made by appellant. Nothing in these instructions appears to be less than evenhanded or to highlight negative evidence against appellant.

On the whole, we find the military judge's instructions to be legally correct, fair, evenly balanced, and well-tailored to the evidence presented. We find no instructional errors that rise to the level of plain error.

### Issue II

■ In the second granted issue, appellant challenges the military judge's rulings with respect to one of appellant's expert witnesses.[4] This witness, a forensic psychiatrist, as a member of the "sanity board" convened to evaluate appellant's "mental condition." RCM 706, Manual, *supra.* Among many types of information considered by the board members, they personally interviewed appellant for a total of some 15 hours.[5]

The issue before us concerns the use the defense wished to make of those 15 hours of interview. Specifically, the defense wanted the expert to repeat or publish to the court members much of what appellant told them regarding his state of mind and emotions at the time of the offense. Defense counsel argued that these statements were admissible under Mil.R.Evid. 703 and 705 (basis of

---

**4.** Though plainly not within the purview of the granted issue, n. 2, *supra*, appellant also attacks the judge's ruling regarding a second defense psychiatrist. Though unnecessary to respond, we reject this assertion outright. That witness, a forensic psychiatrist, had been led far afield by both counsel—especially by government counsel (without defense objection)—into a variety of legal definitions and conclusions. Finally when, on redirect examination by defense counsel, the witness ventured again into a legal definition of premeditation, the military judge intervened, in this manner:

> —— I'm sorry, counsel, I'm going to terminate this inquiry. This has gone far afield. We're now having a witness discuss legal principles and I'm very uncomfortable with it. Members of the court, I will instruct you on what the law is; what premeditation means; and you'll follow my instructions. Captain Mulligan, I'm holding the Government responsible, because I think you drew

> this witness way beyond the purpose of his testimony . . .

Trial defense counsel was permitted to continue the examination of his witness regarding the mental nature of premeditation. Appellant's assertion on brief that,

> in effect, the military judge prevented competent expert testimony on a subject which would have been helpful to the trier of fact, to wit: The appellant's inability to premeditate the crime because of the fact that he was in a rage[,]

is unsupported by the record.

**5.** Under Mil.R.Evid. 302, the evidence considered by the board is privileged and cannot be revealed to the prosecution unless the accused "first introduces into evidence such statements or derivative evidence." Here appellant did introduce such evidence, *inter alia*, by calling the psychiatrists to testify on his behalf in support of the defense attack on the *mens rea* elements of murder and on "heat of sudden passion caused by adequate provocation."

opinion).[6] Moreover, counsel argued that the statements were independently admissible as statements made under the medical-hearsay exception, Mil.R.Evid. 803(4), as exceptions to the rule against hearsay.[7]

Trial counsel disputed that the statements to the sanity board were "made for medical diagnosis or treatment," arguing that "[t]hey were made pursuant to a sanity board that was directed by the court, clearly for litigation purposes." Trial counsel also objected to allowing the witness to relay appellant's statements, because it would amount to the defense "smuggl[ing] the accused's version of events in without having him take the witness stand." [Appellant did not testify on the merits.]

Based on argument of counsel alone, the military judge agreed that the medical-hearsay rule did not apply. He reasoned that a person seeking ordinary medical assistance was "quite different from an individual facing charges of this nature, going before a government compelled sanity board, with a very strong motive to tell the board something other than what may be the truth[.]" Regarding the claim that Mil.R.Evid. 703 and 705 permitted experts to relate an accused's hearsay, the judge asked defense counsel, "[I]f that analysis were so, why wouldn't an accused in every case go tell a doctor everything about the case, and then just call the doctor in. In that way, he could avoid telling his own story from the witness stand?"

Ultimately, citing Mil.R.Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice .... "), the judge ruled that, even if the statements satisfied the medical-hearsay exception, he would "exclude any testimony concerning specific statements made by the accused during the course of the interview with the *doctor*, as I find that its unfair prejudice substantially outweighs its probative value." In so holding, the military judge was consistent with our opinion in *United States v. Stark*, 24 MJ 381, 384–85 (CMA 1987)(military judge did not abuse discretion in excluding psychiatrist's videotaped interviews of accused, which "would have clearly given appellant an opportunity to smuggle eight hours of testimony before the court members without subjecting himself to the crucible of cross-examination"), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 750, 98 L.Ed.2d 763 (1988); *cf. United States v. Neeley*, 25 MJ 105 (CMA 1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988).

It is important to note the boundaries of the matter here in issue. We are not talking about limiting a party's ability to probe the basis of an opinion offered by a party opponent. *See* RCM 705; Giannelli, *Expert Testimony and the Confrontation Clause*, 22 Cap. U.L.Rev. 45 (1993). Nor are we talking about a party's ability generally to develop and support its own experts' opinions. *See United States v. Combs*, 39 MJ 288, 291–92 (CMA 1994). Instead, we are focusing on what has variously been termed "conduit problems," the " 'backdoor' hearsay exception," or simply hearsay smuggling. 3 C. Mueller & L. Kirkpatrick, *Federal Evidence* 685 (2d ed.1994); 2 S. Salzburg, M. Martin & D. Capra, *Federal Rules of Evidence Manual* 1368 (7th ed.1998). Mil.

---

**6.** Mil.R.Evid. 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Mil.R.Evid. 705 provides:

The expert may testify in terms of opinion or inference and give the expert's reasons therefor without prior disclosure of the underlying facts or data, unless the military judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

**7.** Mil.R.Evid. 803(4) provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \*

(4) ... Statements made for purposes of medical diagnosis or treatment and described medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

R.Evid. 403 is a judge's tool for preventing a party from *unfairly* smuggling hearsay, either as "basis" for an expert's opinion or under the various hearsay exceptions. Of course not all "smuggled" hearsay must be excluded at all times; and certainly instructions can often be crafted to guide factfinders when appropriate. Ultimately, the military judge retains considerable discretion in deciding when the prejudice is too great to permit admission of the proffered evidence. *See United States v. Sullivan,* 42 MJ 360, 363 (1995).

Here, appellant's expert was permitted great leeway in explaining not only his conclusions about appellant's mental state, but also about the information he utilized in arriving at those conclusions. Appellant, of course, was free, if he chose, to testify and present his version of the events and his state of mind to the factfinders. Had he done so, the unfairness equation regarding the proffered hearsay evidence would undoubtedly have changed. Under the circumstance, we are satisfied that the military judge did not abuse his discretion. This issue is without merit.

### III

■ In the final issue before us, appellant challenges the military judge's decision to receive in evidence various books or pamphlets found in appellant's quarters. Portions of each item contained information or pictures about knives or knife fighting. One was an Army Field Manual, another a coffee-table picture book about general Army life, still another a mail-order catalog. One booklet and a pamphlet were specifically knife-oriented, denominated respectively: "Everybody's Knife Bible" and "Your Silent Partner." The significance of the materials apparently relates to statements made by appellant at the hospital.

One of the German doctors who rushed to the room described appellant's "logical," "orientated," "clear" statements as follows:

And the context of what he talked to us was that he felt humiliated and betrayed by his wife. I remember that he told us that he found a list in her car with several names. And he repeated some times, all of this. And then he told us that he had learned how to disconnect a head from a human body, but we didn't understand very clearly where he had learned that. We understood that he told us, "I've learned that," and the fact that the head was position [sic] on his neck and did not move at all showed us that that was done, in anatomical terms, in a very adequate way.

Consistent with this description, appellant's wife remembered appellant saying, upon presenting the head to her:

[D]on't underestimate me, I'm very skilled at what I do. I studied this, I planned this, I calculated this.

Apparently in response to such statements, the authorities looked for evidence corroborating this training or skill of appellant. What they found was the books.

The defense moved *in limine* to suppress the materials. The military judge found them to be relevant under Mil.R.Evid. 401 and 402 and not unfairly prejudicial under Mil.R.Evid. 403. Trial counsel did not mention the evidence in his closing argument, and the military judge did not mention it during instructions. Thus, the materials were presented to the factfinders simply as relevant evidence; there was no suggestion that mere possession of the materials amounted to misconduct in any respect.

Appellant now complains that the materials "were totally irrelevant" to his "state of mind," since they were "purchased long before" the offense. He contends prejudice was obvious,

[g]iven the limited scope of the issues before the members, and the fact that *the sole* issue before them was whether or not appellant planned and premeditated this homicide. . . .

But appellant underestimates the logical significance of the evidence at trial, which bore no such restriction. It must be remembered that appellant pleaded not guilty to the Charge and specification, thereby putting all elements in issue. Among those elements was proof that *appellant* killed the deceased.

However obvious it may have appeared in retrospect that it was he who burst into the hospital room with the severed head, it was far from established *ab initio* that it was he also who perpetrated the fatal assault.

To be sure, as appellant himself observes on brief, his trial "defense counsel openly conceded in his opening remarks to the [trial] Court" that "appellant was the perpetrator of this offense." But opening statements are not evidence, much less conclusive evidence. And since it is apparently not easy to cut off a head with a knife, evidence corroborating appellant's expertise in this area seems highly probative of identity at least.

Moreover, just as appellant's gruesome statements at the hospital were undeniably relevant to prove premeditation and intent, so evidence tending to confirm a knowledge of knife weaponry seems equally relevant. *Cf. United States v. Orsburn,* 31 MJ 182 (CMA 1990), *cert. denied,* 498 U.S. 1120, 111 S.Ct. 1074, 112 L.Ed.2d 1179 (1991); *United States v. Mann,* 26 MJ 1 (CMA), *cert. denied,* 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988). Indeed, some of the books are roughly analogous to bomb-making manuals found in the residence of a suspected terrorist. Other portions of the materials, to be sure, were only marginally probative at best. Into this latter group fell the coffee-table book and the mail-order catalog. But by the same token, these materials had no prejudicial potential. Art. 59(a). On the whole, we conclude that the military judge did not abuse his discretion in receiving the evidence.

The decision of the United States Army Court of Criminal Appeals is affirmed.

Judges SULLIVAN, CRAWFORD, GIERKE, and EFFRON concur.