**UNITED STATES, Appellee,**

v.

**Private E2 Peter T. ROUKIS, Jr., United States Army, Appellant.**

**ARMY 9800587.**

U.S. Army Court of Criminal Appeals.

2 March 2005.

For Appellant: David P. Sheldon (argued); Karen L. Hecker; Major Sean S. Park, JA (on brief); David P. Sheldon; Karen L. Hecker; Captain Katy Martin, JA (on reply brief).

For Appellee: Captain Janine P. Felsman, JA (argued); Colonel Lauren B. Leeker, JA; Lieutenant Colonel Margaret B. Baines, JA; Major Jennifer H. McGee, JA (on brief).

Before HARVEY, BARTO, and SCHENCK Appellate Military Judges.

## OPINION OF THE COURT

PER CURIAM:

A general court-martial composed of officer and enlisted members authorized to adjudge death [1] convicted appellant, contrary to his pleas, of absence without leave, premeditated murder, and assault consummated by a battery, in violation of Articles 86, 118, and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 886, 918, and 928, respectively [hereinafter UCMJ]. The convening authority approved the adjudged sentence consisting of a dishonorable discharge, confinement for life, forfeiture of all pay and allowances, reduction to Private E1, and a reprimand.

This case is before the court for review pursuant to Article 66, UCMJ, 10 U.S.C. § 866. Appellant asserts a number of issues on appeal; none have merit, but appellant's two claims that the evidence is insufficient to establish premeditation and that the sentence is inappropriate warrant some discussion.

### Background

Appellant and Jennifer Passalacqua met when they were both attending basic training at Fort Jackson, South Carolina. They married on 29 November 1996 as they neared the completion of their training. After graduation, appellant and Jennifer were assigned to separate companies at Fort Polk, Louisiana. Not long after arriving, their marital discord turned violent.

On 9 February 1997, appellant and Jennifer argued while they were at the local Wal-Mart, but Jennifer walked away from appellant before the conflict became physical. Approximately two hours later, appellant found Jennifer coming out of Wal-Mart, drove up behind her, and told her to get into his car. When Jennifer refused and kept walking, appellant got out of his car, walked up behind her, and choked her with his hands until she almost passed out.

On the next duty day, Jennifer reported the battery to her chain of command. As a result, appellant and Jennifer were referred to the Army's Family Advocacy Program, and began attending individual and group counseling sessions. As the counseling progressed, Jennifer continued to live with appellant in their on-post quarters. Their marital situation, however, did not improve.

In late March, appellant and Jennifer got into another argument because Jennifer had stayed out all night at a party and appellant concluded Jennifer was having an extramarital affair. Jennifer moved into the barracks after appellant threw her clothes out of their on-post quarters. Soon after, she sought counseling from a chaplain and a separation agreement from a military legal assistance attorney. Jennifer told the chaplain that she was afraid of appellant after the Wal-Mart incident and was going to file for divorce.

---

1. This was a "capital case" in that the convening authority referred an offense punishable by death, i.e., premeditated murder, to a general court-martial "without an instruction that the case be treated as noncapital." Rule for Courts-Martial [hereinafter R.C.M.] 103(2).

Their relationship became more strained when a friend of appellant's, Private (PVT) Daniel Nichols, told appellant that he had seen Jennifer in her car with another man. Appellant responded that should Jennifer leave him, he "might do something stupid, kill her or something."

In the days leading up to Jennifer's death, appellant unsuccessfully attempted to visit Jennifer at the barracks and tried to contact her by phone to express his despair at the direction their marriage was heading. Jennifer's mother and brother then came to Fort Polk to offer their guidance and support to Jennifer and appellant. They also wanted to say goodbye to appellant, who was scheduled to deploy to Bosnia within a few months. At the end of her family's visit, Jennifer announced that she was going to give her marriage to appellant one more try. Jennifer, however, delayed moving back in with the appellant, although she continued to meet appellant for lunch and had intimate relations with him. Appellant once again became suspicious that Jennifer was having an extramarital affair.

On Saturday, 19 April 1997, Jennifer told appellant that she could not move back in with him due to "a military transport mission." In actuality, Jennifer and Specialist (SPC) Timothy McCarty took a friend to the airport. After drinking a few beers, appellant could not sleep and spent several hours looking for Jennifer between the barracks and the motor pool. Appellant eventually saw Jennifer coming out of the barracks with SPC McCarty, and appellant confronted them in the parking lot.

Jennifer told appellant that SPC McCarty was driving her to the firing range. Suspecting that Jennifer was cheating on him with SPC McCarty, appellant lied and told Jennifer that his father was dying and that he needed her to come home with him. Jennifer agreed to go with appellant and started to walk away with him. Specialist McCarty then saw that appellant was excited, yelling and waving his arms at Jennifer, so SPC McCarty called out to Jennifer to come back to where he was standing. Jennifer returned with appellant, and appellant cursed at SPC McCarty when SPC McCarty asked what was wrong. Specialist McCarty noticed that appellant's lips were quivering and his hands were shaking. Specialist McCarty asked to speak with Jennifer alone and, outside appellant's hearing, warned her not to go with appellant because "he was not acting right." Jennifer told SPC McCarty, "I'll be back in an hour," but SPC McCarty never saw Jennifer again.

Appellant and Jennifer were alone after they arrived at their quarters.[2] Appellant immediately demanded that Jennifer tell him the truth about her relationship with SPC McCarty. Jennifer initially denied that she was having an affair, but later admitted to engaging in sexual intercourse with SPC McCarty. Appellant was angry and began to ask more questions. Jennifer then picked up her car keys and attempted to leave the quarters. Appellant then struck her in the face with his fist and knocked off her glasses. She dropped her keys and began to fall, crying out—"Peter, No!" Appellant grabbed her around the neck as she fell and began to choke her. Appellant continued to choke her until he could no longer hold her due to fatigue. He then put Jennifer in a headlock until he could regain his strength. As she slid to the ground, he shoved his fist into her neck to further prevent her from breathing. Appellant later recounted that it was during this time that he thought to himself, "Peter, this is all wrong—what are you doing?"

Appellant recognized that Jennifer was apparently losing consciousness, but then he saw her stomach move and realized that she was still alive. Appellant "was overcome with a fear that she would report his behavior to the chain of command ... [and thought] 'she'll tell someone [he had] done this and things will be even more messed up.'" He saw a bootlace nearby, grabbed it, wrapped it twice around her neck, and

---

**2.** Appellant's statements during the inquiry into his mental responsibility provide the only eyewitness account of Jennifer's last few minutes of life. An extract of the report concerning appellant's mental responsibility was prepared under the provisions of R.C.M. 706 and admitted into evidence without objection. The extract summarized and quoted appellant's statements describing his actions.

pulled. Appellant listened for further breathing from Jennifer as he pulled the bootlace tighter around her neck, and then checked for a pulse. He realized that Jennifer was still alive when he detected her pulse.

Appellant then went to the kitchen and selected two knives from a drawer: a serrated knife and a carving knife. As he took the knives out, he heard what he believed to be Jennifer's breath escape from her lungs. He later described his anxiety about being caught, saying, "If there had been a sword or a gun in the house I would have used it. I wanted her dead, I needed to be sure she wouldn't talk." He proceeded to stab Jennifer with the serrated knife, but it bent as he stabbed through her breast. He next tried to cut her neck using the same knife, but it was equally ineffective. Appellant then took the larger carving knife and "continued to slice" in a sawing motion back and forth across Jennifer's throat. Appellant finished by embedding the carving knife so deeply into Jennifer's neck that approximately four inches of the knife extended out the other side of her neck. He knew that Jennifer was dead because he saw that "her eyes were dull and kind of rolled back in her head." Appellant quickly cleaned himself and left the area in his car.

On Monday morning, 21 April 1997, after appellant and Jennifer both failed to report to their respective morning formations or work call, military authorities discovered Jennifer's lifeless body on the living room floor of appellant's on-post quarters with a bootlace still wrapped around her neck, a stab wound in her chest, and the carving knife still imbedded in her neck. Appellant was eventually apprehended in New York, where he was staying with his parents during his unauthorized absence. While in the custody of the New York City Police Department, appellant spontaneously stated to a nearby detective; "If your wife was fucking everybody on the base, you would have done the same thing that I did? You would have killed her, too, just like I did." Upon return to military custody, appellant also told Special Agent Marker of the U.S. Army Criminal Investigation Command that "he had killed his wife, but it was not premeditated."

Appellant's defense at trial centered on the question of whether he premeditated the death of his wife or lacked the ability to do so because he suffered from various mental disorders, was acting out in a "blind rage," or both. An inquiry into appellant's mental capacity or responsibility was conducted prior to trial, and concluded that appellant did not have a severe mental disease or defect at the time of the killing. The inquiry did conclude, however, that appellant suffered from "Major Depressive Disorder, Recurrent, Moderate" and "Marital Problem" on Axis I,[3] and from "Personality Disorder, not otherwise specified with narcissistic and antisocial features" on Axis II.[4] Three mental health professionals testified on appellant's behalf at trial.

A forensic psychiatrist, Major (Dr.) David Benedek, participated in the pretrial inquiry into appellant's mental responsibility and testified on behalf of appellant at trial. At trial, Dr. Benedek stood by the earlier diagnosis described above, and opined that appellant had not premeditated "at the time [he] embarked on his altercation that resulted in his wife's death." Doctor Benedek further testified that appellant's "mental state, his emotions at that time, were a mixture of ongoing despair, of a sense of betrayal and tremendous anger." On cross-examination, Dr. Benedek conceded that appellant had intended to kill his wife at some point during the offense, and that appellant had told him, "If there had been a sword or a gun in the house I would have used it. I wanted her dead, I needed to be sure she wouldn't talk."

---

**3.** Axis I is where mental health professionals place the major mental disorders, including mood, thought, and anxiety disorders.

**4.** Axis II is where mental health professionals code personality and developmental disorders that are of a chronic nature. A personality disorder is a lifelong condition that represents a pattern of maladaptive behaviors and other unheal-

thy ways of dealing with stress. These disorders are subcategorized into several different varieties and an evaluation will determine if the patient meets the criteria for a specified personality disorder. If a person has characteristics from several disorders, but not enough characteristics to be classified under a specific disorder, the diagnosis will be one of "not otherwise specified."

Another forensic psychiatrist, Lieutenant Commander (Dr.) Kevin Moore, United States Navy, examined appellant before trial and testified on his behalf. Doctor Moore diagnosed appellant with a variety of mental disorders, including "Major Depressive Episode, Recurrent," "Partner Relational Problem," and "Severe Personality Disorder, Not Otherwise Specified." Doctor Moore testified that appellant was having "a fit of rage" at the time of the offense, and "that, because of [appellant's] vulnerabilities and because of the stress at that time, that it was unlikely that he could have premeditated." Like Dr. Benedek, however, Dr. Moore also acknowledged that appellant had the intent to kill his wife at the time of the offense, and opined that appellant did not suffer from a severe mental disease or defect at that time.

A clinical psychologist, Commander (Dr.) Jerry Brittain, United States Navy, examined appellant and testified on his behalf at trial. Doctor Brittain acknowledged that appellant did not have a severe mental disease or defect, but he did determine appellant had a "Personality Disorder, not otherwise specified with narcissistic and borderline features." Doctor Brittain testified that an individual with a "borderline personality" may, under severe stress, have a "mini-psychotic event" in which the person becomes "acutely psychotic for very short periods of time and then will reconstitute and then will not be psychotic." While Dr. Brittain recognized that appellant did not have a "borderline personality," he nevertheless agreed with the proposition that appellant "might have had a mini-psychotic episode" as a result of "narcissistic rage" on the date of the offense at issue. Doctor Brittain speculated that if appellant had, in fact, experienced a "mini-psychotic episode" while assaulting and killing Jennifer, appellant would not have been able to appreciate the nature and quality or wrongfulness of his conduct. Moreover, Dr. Brittain opined that appellant could not possess a premeditated design to kill.

Notwithstanding this testimony, the panel returned nonunanimous findings of guilty as to all offenses.

## Discussion

Appellant asserts that the evidence is legally and factually insufficient to support the guilty findings as to premeditated murder. "Any person subject to this chapter who, without justification or excuse, unlawfully kills a human being, when he ... has a premeditated design to kill ... shall suffer death or imprisonment for life as a court-martial may direct." UCMJ art. 118. "Premeditated murder is murder committed after the formation of a specific intent to kill someone and consideration of the act intended. It is not necessary that the intention to kill have been entertained for any particular or considerable length of time." *Manual for Courts–Martial* (1995 ed.), Part IV, para. 43c(2)(a) [hereinafter *MCM*]; *see United States v. Cole*, 54 M.J. 572, 580 (Army Ct. Crim.App.2000).

■ However, an accused cannot be found guilty of premeditated murder if, at the time of the killing, his mind was so confused by rage or fear that he could not or did not premeditate. Dep't of Army, Pam. 27–9, Legal Services: Military Judges' Benchbook, para. 3–43–1, at 401 (30 Jan. 1998) [hereinafter DA Pam 27–9]. Such "[a]n unlawful killing, although done with an intent to kill or inflict great bodily harm, is not murder but voluntary manslaughter if committed in the heat of sudden passion caused by adequate provocation." *MCM*, Part IV, para. 44c(1)(a); *see* UCMJ art. 119(a), 10 U.S.C. § 919(a); *United States v. Schap*, 49 M.J. 317, 321 (C.A.A.F.1998). Conversely, "[t]he provocation must be adequate to excite uncontrollable passion in a reasonable person, and the act of killing must be committed *under and because of the passion.*" *MCM*, Part IV, para. 44c(1)(b) (emphasis added).

■ We have weighed the evidence and made allowances for not having personally observed the witnesses. *See* UCMJ art. 66(c). As a threshold matter, we find that appellant did not have a severe mental disease or defect. We also find that, notwithstanding an apparent personality disorder, appellant consciously conceived the thought of taking Jennifer's life well before he murdered her. For example, appellant told PVT

Nichols before the murder that he might kill Jennifer if she left him.

Appellant also had numerous opportunities to consider and reconsider his intentions and desist during his escalating series of assaults upon Jennifer. We find appellant considered his actions when he first shoved his fist into Jennifer's neck to prevent her from further breathing and thought to himself, "Peter, this is all wrong—what are you doing?" Appellant also reconsidered his actions and intent to kill Jennifer when he realized that she was still alive after his failed efforts to manually strangle her and he "was overcome with a fear that she would report his behavior to the chain of command ... [and thought] 'she'll tell someone I've done this and things will be even more messed up.' "

We also find that appellant further considered his actions when, after failing to strangle Jennifer with a bootlace, he checked her body for a pulse, discovered that she was still alive, left the room, entered the kitchen, sifted through a drawer looking for a knife, and returned with two knives to where Jennifer lay so that he could be "sure she wouldn't talk." Appellant then reconsidered his actions a final time after he tried to stab Jennifer with the serrated knife, which bent as he stabbed through her breast. This consideration is evidenced by the fact that appellant shifted his efforts and tried to cut Jennifer's neck using the same knife, but it was equally inadequate to that task. Appellant then took the larger carving knife, "continued to slice" in a sawing motion back and forth across Jennifer's throat, and completed the homicide by embedding it in Jennifer's neck.

Moreover, we need not accept as conclusive the expert opinions that appellant could not premeditate Jennifer's death, and note that Drs. Benedek and Moore both admitted that their diagnoses did not rule out the possibility that appellant had a premeditated design to kill. The fact that appellant may have been enraged at the time of the killing, whether as a result of his particular personality disorder or the circumstances of his

marriage, "does not necessarily demonstrate that he was deprived of the ability to premeditate or that he did not premeditate." DA Pam 27–9, para. 3–43–1, at 401–02; *see Schap*, 49 M.J. at 321–324.

As our superior court noted in *United States v. Hoskins*, 36 M.J. 343 (C.M.A.1993),

It has been suggested that for premeditation the killer asks himself the question, 'Shall I kill him?' The intent to kill aspect of the crime is found in the answer, 'Yes, I shall.' The deliberation part of the crime requires a thought like, 'Wait, what about the consequences? Well, I'll do it anyway.'

*Id.* at 346 (quoting W. LaFave and A. Scott, *Substantive Criminal Law* § 7.7(a) (1986)). This passage closely describes appellant's thought process in this case. Considered in this light, appellant's multiple opportunities for cool reflection upon his intended acts are more than sufficient to persuade us beyond a reasonable doubt that appellant had a premeditated design to kill Jennifer during his assault upon her.[5] *See MCM*, Part IV, para. 43b(1)(d). Based on all the evidence and our findings of fact above, we are satisfied beyond any reasonable doubt of the appellant's guilt of the offenses of which the members found him guilty. *See generally United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) (setting forth the test for factual sufficiency). Having found the evidence factually sufficient, it is self-evident that we also conclude that it is legally sufficient. *See generally Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (setting forth the test for legal sufficiency).

■ Appellant also contends that life imprisonment is inappropriately severe under the circumstances of his case. This court may approve only so much of the sentence as is appropriate. UCMJ art. 66(c). We must "independently determine, in every case within our limited Article 66, UCMJ, jurisdiction, the sentence appropriateness of each case we affirm." *United States v. Bauerbach*, 55 M.J. 501, 506 (Army Ct.Crim.App. 2001). Sentence appropriateness should be

---

5. We agree with the members' determination that appellant had sufficient mental capacity to have the premeditated design to kill and that he did not act "in the heat of sudden passion" to the

degree that it prevented "cool reflection." *See United States v. Eby*, 44 M.J. 425, 428 (C.A.A.F. 1996).

evaluated through " 'individualized consideration' of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender." *United States v. Snelling,* 14 M.J. 267, 268 (C.M.A. 1982) (quoting *United States v. Mamaluy,* 10 U.S.C.M.A. 102, 106, 27 C.M.R. 176, 180–81, 1959 WL 3587 (1959)). A soldier "should not receive a more severe sentence than otherwise generally warranted by the offense, the circumstances surrounding the offense, his acceptance or lack of acceptance of responsibility for his offense, and his prior record." *United States v. Aurich,* 31 M.J. 95, 97 n. * (C.M.A.1990); *see Bauerbach,* 55 M.J. at 505–06. Accordingly, the punishment should "fit the offender and not merely the crime." *United States v. Wright,* 20 M.J. 518, 519 (A.C.M.R.1985). This court can conduct such review even in a case where the sentence adjudged was a mandatory minimum of confinement for life in prison. *See United States v. Jefferson,* 7 U.S.C.M.A. 193, 194, 21 C.M.R. 319, 320, 1956 WL 4585 (1956) (holding board of review has power to reduce sentence without reducing findings in premeditated murder case); *United States v. Anderson,* 36 M.J. 963, 987 (A.F.C.M.R.1993) (reviewing sentence appropriateness issue under Article 66(c) in premeditated murder case with mandatory minimum sentence).

Appellant's acts, character, and mental state at the time of the offense place this case squarely within the "heartland" of premeditated-murder offenses. Notwithstand-

ing appellant's mental condition, we find no reason in the record of this case to depart from the mandatory minimum sentence established by Congress for premeditated murder. *See* UCMJ art. 118. A sentence of confinement for life is, under the facts of this case and in our specific determination, fair, just, and appropriate. *See United States v. Baier,* 60 M.J. 382, 384 (C.A.A.F.2005) (citing *Bauerbach,* 55 M.J. at 504).

The remaining issues raised by appellant are without merit. We note, however, that the convening authority's initial action and promulgating order failed to reflect the 365 days of confinement credit that the parties agreed were due to appellant for his time in pretrial confinement.[6] We will correct this administrative error rather than returning appellant's case to the convening authority. The appellant will be credited with 365 days of confinement against the sentence to confinement. *See United States v. Delvalle,* 55 M.J. 648, 649 n. 1, 656 (Army Ct.Crim.App. 2001); *United States v. Arab,* 55 M.J. 508, 510 n. 2, 520 (Army Ct.Crim.App.2001).

The findings of guilty and the sentence are affirmed.

---

6. *See* Army Reg. 27–10, Legal Services: Military Justice [hereinafter AR 27–10], para. 5–28a (24 Jun. 1996) (requiring that sentence credits be included in initial action). This requirement remains in effect. *See* AR 27–10, para. 5–31a (6 Sept. 2002).