UNITED STATES, Appellee,

v.

Private First Class Taori E. RANSOM, United States Army, Appellant.

ARMY 9800994.

U.S. Army Court of Criminal Appeals.

22 April 2002.

For Appellant: Richard T. McNeil (argued); Mary Ramsay McCormick (on brief); Captain Runo C. Richardson, JA.

For Appellee: Captain Karen J. Borgerding, JA (argued); Colonel Steven T. Salata, JA; Lieutenant Colonel Paul H. Turney, JA; Major Margaret B. Baines, JA (on brief).

Before CAIRNS, Senior Judge, CHAPMAN, and JOHNSON, Appellate Military Judges.

OPINION OF THE COURT

CAIRNS, Senior Judge:

At a fully contested general court-martial, officer and enlisted members convicted the appellant of attempted kidnapping, rape (three specifications), forcible sodomy (three specifications), assault with a dangerous weapon, assault consummated by a battery (two specifications), adultery, communicating a threat, and kidnapping in violation of Articles 80, 120, 125, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 920, 925, 928, and 934 [hereinafter UCMJ]. The convening authority approved the adjudged sentence of a dishonorable discharge, forfeiture of all pay and allowances, reduction to Private E1, and confinement for life. The appellant was credited with 271 days of con-

finement against the sentence to confinement.

In this Article 66, UCMJ, 10 U.S.C. § 866, appeal, the appellant assigns four errors, the following three of which we address in our opinion below: (1) that the findings of guilty are legally and factually insufficient;[1] (2) that the military judge erred in prohibiting any mention of the coactor's sentence; and (3) that the sentence which includes confinement for life is inappropriately severe for this appellant. Finding no errors materially prejudicial to the appellant's substantial rights, and finding no merit to the assigned errors, we affirm the findings and sentence.

### Facts

Exercising our Article 66(c), UCMJ, fact-finding powers, we find the following facts. On the evening of 17 October 1997, the appellant and his friend, Specialist (SPC) Benton, consumed beer and drove around the community adjacent to Fort Lewis, Washington, looking for girls. Specialist Benton drove the appellant's car. During the course of the evening, the appellant consumed about five cans of beer, and at some point in time, he vomited.

At about 2220 hours that evening, a sixteen-year-old girl named AM was walking home along Pacific Highway in Tacoma, Washington, after buying some orange juice at a convenience store. Either the appellant or SPC Benton yelled something at AM as they drove by her, but she put her head down and continued walking. Specialist Benton turned the car around, drove past AM, and came to a stop on the side of the road in front of her. The appellant, who was the passenger, exited the car, walked toward AM, and asked her if she wanted a ride. When she replied that she did not, the appellant stated, "Yeah, you are." He grabbed her sweater and tried to put her in a headlock, but his arm slipped over her head. Remembering a defensive move she had seen on television, AM freed herself from the appellant by extending her arms straight out, ducking her head and torso down, and allowing herself to slip out of her sweater. Wearing only a bra and her shorts, AM ran out into oncoming traffic and flagged down a motorist for assistance. The appellant and SPC Benton departed the area.

Later that evening, SPC Benton and the appellant drove by a home occupied by SPC VT. Specialist VT's girlfriend, Private First Class (PFC) GR, and her cousin, CM, an out-of-town guest, were standing in the driveway of SPC VT's house having a discussion. While they were talking, the appellant got out of his car carrying a gun. He pointed the gun at CM, grabbed her neck, pushed her head down, and pulled her toward the car. When PFC GR tried to stop the appellant, he hit her above her right eye with the gun, causing a gash that later required six stitches to close. The appellant pushed CM into the back seat of the car, got in beside her, and SPC Benton drove them away.

When CM asked the men who they were and "what was going on," the appellant told her to "shut up," and SPC Benton told her he was "Makaveli." The appellant ordered CM to remove her clothes. When she said "No, I'm cold," the appellant pointed his loaded handgun at her head and said, "[T]ake your clothes off or I'll kill you." He then told her to perform fellatio on him and pushed her head down to his penis. The appellant then forced CM to take his penis into her mouth and made her gag. Afterwards, the appellant ordered CM to lie down on the back seat, and he engaged in sexual intercourse with her by force and without her consent. CM was "really scared" because the appellant had a gun and threatened to kill her.

After having raped CM, the appellant told SPC Benton to find a dead end because he was worried that someone was following them. Specialist Benton pulled over near a tree line, and they all got out of the car. Wearing only her bra and socks, CM repeatedly asked if she could have her sandals. The appellant finally threw CM's sandals at her, and then pulled her by her hair to a barbed wire fence near the wood line. The

---

1. Legal and factual insufficiency were raised in an assigned error "presented pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982)."

appellant held the fence open for CM, but her hair became caught in the barbed wire.

After they went through the fence, they all proceeded into the woods. Once in the woods, the appellant ordered CM to kneel down and perform fellatio on SPC Benton. Terrified, and not seeing an opportunity for escape, CM complied. Then the appellant told SPC Benton to go back and move the car so that nobody could see it. Specialist Benton returned to the car, but instead of just moving it, he drove off. After SPC Benton left the woods, the appellant told CM to lie on her stomach, and he raped her again. They then walked back to the location where the car had been parked and waited for SPC Benton to return. While they were waiting, the appellant gave CM his sweat shirt to wear because it was cold and she was trying to cover herself. The appellant told CM that if she said anything about what had happened, that he knew where her friends lived, and he would kill them.

After waiting for about thirty minutes, the appellant and CM started walking toward the area where CM had been kidnapped. While they were walking, the appellant asked CM questions and CM asked the appellant why they had picked her. The appellant told her that they had driven around the block five times, and she and her cousin had been standing outside each time, "so they just decided to take [her]." The appellant also said that he had done this once before.

As they were walking, the appellant told CM, "I want to do it again." He took her into the wood line and again forced her to perform fellatio on him, and then raped her for a third time. While he was raping her, the appellant asked CM what she would do if she got pregnant. She said that she did not believe in abortion, and the appellant told her to "keep it" and to "[t]each them [sic] right from wrong, not like [he] was taught." CM said that the appellant ejaculated because she could "feel it running ... down [her] leg." [2]

When the appellant finished raping CM for the third time, they walked for about thirty minutes until they reached a residential area. The appellant told CM that she could leave, and CM thanked the appellant for not killing her. After they went their separate ways, CM was picked up by Pierce County police officers as she was walking back to SPC VT's house.

Immediately after CM was abducted, SPC VT and PFC GR reported the attack and abduction by calling "911." On his own initiative, SPC VT drove his car around the area, searching for signs of CM. Specialist VT observed the perpetrator's car and followed it as SPC Benton left the scene of the rape and sodomy in the woods. Specialist VT called "911" and told the operator that he was following "a suspicious vehicle in the area." As a result, the civilian police eventually stopped and apprehended SPC Benton. Specialist Benton rendered an inculpatory statement that also implicated the appellant. Neither SPC Benton's statement nor any specific inculpatory facts contained therein were presented to the panel.

At about 0720 on the morning following the attacks on CM, the civilian police attempted to contact the appellant at his apartment. The appellant and his wife tried to hide the fact that the appellant was present in his apartment. Ultimately, the appellant surrendered, and he and his wife consented to a search of their apartment. The police recovered the appellant's sweat pants that had muddy knee marks at mid-thigh level on the pants. The mud marks were consistent with what would be expected from one lowering one's pants and kneeling on the ground.

The police apprehended the appellant. During the time he was in custody, the appellant was neither intoxicated nor exhibiting any residual effects of having consumed alcohol the previous evening. After receiving proper rights warnings, the appellant rendered a false story about what had happened. He claimed that, after drinking beer, he and SPC Benton drove around looking for girls. Observing two girls in a driveway, they stopped and asked if they were "working

2. Under cross-examination, CM clarified that the appellant ejaculated all three times that he raped her.

girls." According to the appellant's story, one of the girls said "yes," got into the car, and agreed to have sexual intercourse with them for $20.00 each. The appellant and SPC Benton switched off driving as the other had sexual intercourse with her.

After they had sex with her, the appellant said the girl became "weird," although he would not describe how. The appellant stated that, for some unspecified reason, he and the girl exited the vehicle, and SPC Benton inexplicably drove off with the girl's clothes still in the car.

The police did not believe the appellant's story because they had interviewed the victims and witnesses and had taken a statement from SPC Benton in which he inculpated himself and the appellant. The police told the appellant that they did not believe him, and they played an audio tape recording of part of SPC Benton's statement. Upon hearing the tape, the appellant slumped forward on the table, put his head in his hands, started to cry, and said, "How much time am I going to get?"; "What's going to happen to my wife and baby?"; and "It wasn't supposed to happen that way."

The appellant then admitted, in response to leading questions by the police, that he assaulted PFC GR by striking her with a gun in the driveway, forced CM into the back seat of his car at gunpoint, ordered her to disrobe, and forced her to have sexual intercourse with him. He further admitted taking CM through the barbed wire into the woods and having sexual intercourse with her again. After SPC Benton left, the appellant and CM started walking back to the housing area, and along the way, the appellant admitted taking her into the woods and raping her again. At some point, he gave CM his sweat shirt because she was naked and cold.

At his trial, the appellant testified to a third, and significantly different, version of what happened. He testified that, after drinking and getting sick that evening, he told SPC Benton that he "was done for the night" and wanted to go home. As SPC Benton was driving, he stopped where some girls were standing. The appellant said he was not paying much attention, but SPC Benton got out and returned with a girl, CM, who got into the backseat of the car. Spe-cialist Benton drove, with the appellant in the front passenger seat, until they came upon a secluded area. All three exited the vehicle, and SPC Benton and CM went into the woods while the appellant stayed by the vehicle still feeling the effects of alcohol. A short time later, SPC Benton returned and—without even acknowledging the appellant—drove off in the appellant's car, leaving the appellant on the side of the road. Then, CM came out of the woods, got the appellant's attention, and asked him what his friend was doing. In the appellant's words, CM "seemed fine, besides being naked." The appellant offered her his sweat shirt and sweat pants, but she only accepted the sweat shirt. The appellant testified that he then walked her back to the residential area. He denied engaging in sexual intercourse or sodomy with CM. The appellant further denied any involvement in the attempted abduction of AM or ever seeing AM prior to the court-martial litigation.

The appellant explained that, after his apprehension, the police accused him of lying when he told his first story. He said they yelled at him and threatened him by telling him that he would never see his family again and asking whether he knew what happens to a rapist in jail. This treatment made him cry, and he decided to "just [tell] them what they wanted to hear." He answered their leading questions by "just say[ing] either yes or no," but "in [his] heart [he] knew it wasn't true."

On cross-examination, the appellant denied telling the police the initial story about asking CM if she was a working girl and procuring her to engage in sexual intercourse with him and SPC Benton for $20.00 a piece. He admitted to later agreeing with the police when they said he had raped CM and had attempted to abduct AM, but he maintained that story was not true. Finally, the appellant testified that prior to his testimony, he only told this in-court version to his lawyer, because "[h]e was the only one who would believe me."

## DISCUSSION

### a. Sufficiency of the Evidence

We have weighed the evidence and made allowances for not having personally ob-

served the witnesses. We find the appellant's testimony at trial to be incredible, inconsistent with the vast weight of the evidence, and false in all material respects. *See* UCMJ art. 66(c). On the other hand, we find the testimony of CM, AM, PFC GR, and SPC VT to be credible and persuasive. The appellant's admissions to police, when confronted by SPC Benton's tape-recorded statement, are consistent with the other evidence of his guilt. Based on all the evidence and our findings of fact above, we are satisfied beyond any reasonable doubt of the appellant's guilt of the offenses of which the members found him guilty. *See generally United States v. Turner,* 25 M.J. 324, 325 (C.M.A.1987) (setting forth the test for factual sufficiency). Having found the evidence factually sufficient, it is axiomatic that we conclude it is legally sufficient. *See generally Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (setting forth the test for legal sufficiency).

### b. *Grill* Issue

■ In his third assigned error, the appellant asserts that the military judge committed reversible error by granting a government motion in limine to prohibit any mention of SPC Benton's sentence. Citing *United States v. Grill,* 48 M.J. 131 (1998), the appellant argues that the military judge's ruling violated his right to mention his coactor's sentence during his unsworn statement. We disagree.

Although the litigation of the motion in limine was muddled at trial, what is clear is that the parties were attempting to set the ground rules for SPC Benton's immunized testimony on the merits. The defense counsel naturally wished to impeach SPC Benton's testimony. One avenue of attack was to show SPC Benton's bias or self-serving motive in testifying for the government so that he might obtain sentence relief. To the extent he made a ruling, the military judge advised the civilian defense counsel that he could explore those issues, but that testimony regarding the specific nature of SPC Benton's sentence was "generally ... out of bounds."

While the military judge made several overly-broad statements which, when viewed out-of-context, were arguably inconsistent with the principles in *Grill,* we are satisfied that no reasonable practitioner would have interpreted the military judge's comments as restricting his or her client's unsworn statement during the sentencing phase of trial. The military judge's comments specifically addressed the impeachment of SPC Benton's testimony on the merits. The civilian defense counsel's responses make it clear he understood that he could and would litigate the issue further in an out-of-court hearing if it became necessary. The civilian defense counsel did not raise the issue again, and SPC Benton did not testify. We note that the civilian defense counsel zealously represented his client throughout the trial and never shied away from raising issues or requesting reconsideration or clarification of the military judge's rulings. Under these circumstances, we hold there was no error.

### c. Sentence Appropriateness

Article 66(c), UCMJ, mandates that we approve only "such part or amount of the sentence" in a case as we determine "on the basis of the entire record, should be approved." UCMJ art. 66(c). Our statutory responsibility in determining sentence appropriateness requires "individualized consideration" of an appellant's sentence " 'on the basis of the nature and seriousness of the offense and the character of the offender.' " *United States v. Snelling,* 14 M.J. 267, 268 (C.M.A.1982) (quoting *United States v. Mamaluy,* 10 U.S.C.M.A. 102, 106–07, 27 C.M.R. 176, 180–81, 1959 WL 3587 (C.M.A. 1959)). The appellant contends that his "sentence to confinement for life is an extreme punishment under the circumstances of this case, particularly where appellant's coactor was only sentenced to confinement for 30 *months."* Brief for Appellant at 7.

■ In determining sentence appropriateness, we are not required to resort to sentence comparison except " 'in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases.' " *United States v. Sothen,* 54 M.J. 294, 296 (2001) (quoting *United States v.*

*Ballard,* 20 M.J. 282, 283 (C.M.A.1985)). "An appellant who asks [us] to engage in sentence comparison bears the burden of demonstrating that any cited cases are 'closely related' to the appellant's case, and that the sentences are 'highly disparate.'" *Sothen,* 54 M.J at 296 (citing *United States v. Lacy,* 50 M.J. 286, 288 (1999)). Once an appellant meets this burden (or once we, on our own, determine the cases are closely related and the sentences are highly disparate), the burden shifts to the government to demonstrate a rational basis for the disparity. *Id.*

 We have taken judicial notice of the promulgating order in SPC Benton's court-martial, as well as the mitigation evidence presented at SPC Benton's trial, found at pages 836–858 of SPC Benton's record of trial. Specialist Benton was charged with precisely the same offenses as the appellant, but he was convicted only of one specification of forcible sodomy of CM and kidnapping CM. In a published opinion, this court affirmed the findings and the approved sentence to a bad-conduct discharge, confinement for two years and six months, forfeiture of all pay and allowances, and reduction to Private E1. *United States v. Benton,* 54 M.J. 717 (Army Ct.Crim.App.2001), *pet. granted,* 55 M.J. 244 (2001).

We are satisfied that the respective courts-martial of the appellant and SPC Benton were closely related because these two offenders were coactors involved in a common course of criminal conduct. *See generally Lacy,* 50 M.J. at 288–89. While SPC Benton was acquitted of eleven specifications of which the appellant was convicted (including attempted kidnapping, three specifications of rape, two specifications of forcible sodomy, aggravated assault, two specifications of assault consummated by a battery, adultery, and communicating a threat), they were each convicted of forcible sodomy and kidnapping based on the same underlying facts. Despite SPC Benton's acquittals, there was a direct nexus between the criminal conduct of these two perpetrators. *Id.*

It is self-evident that the appellant's and SPC Benton's sentences are highly disparate. Accordingly, we must not only determine whether the appellant's sentence was appropriate based on the nature and seriousness of the offenses and the character of this appellant, but we must also assess sentence appropriateness by considering whether the government has demonstrated a rational basis for the disparate sentences. *See United States v. Durant,* 55 M.J. 258 (2001).

### 1. Nature and Seriousness of the Offense/Character of the Offender

Putting the sentence comparison aside for the moment, if ever there was an offender who deserved life imprisonment for violent crimes against others, none of whom sustained grievous bodily harm or death, this is the offender. In the course of one evening, the appellant attempted to abduct a sixteen-year-old girl, pistol whipped a second woman (causing severe bleeding, six stitches, and a scar over her eye), and kidnapped a third innocent female victim. All of his attacks were random; none of his victims had ever met the appellant before he victimized them.

Our earlier findings of fact demonstrate the brutality of the appellant's attack on CM. In summary, after kidnapping CM, the appellant pointed a loaded pistol at her head, demanded that she disrobe, forced her to accept his penis into her mouth, raped her, ordered his accomplice to find a secluded area, pulled CM into the woods, forced her to sodomize SPC Benton, raped her again, threatened her friends' lives, forced her to sodomize him once more, and raped her a third time.

In describing the chilling terror to which she was subjected that evening, CM testified that she prayed for her life while the appellant attacked her in the woods because she believed she would be killed. In addition to enduring the appellant's repeated attacks that evening, she explained how her life had been inalterably changed by the appellant's crimes. CM thinks about the attack every day and testified, "I can never forget about that night. . . . I will never feel safe again." She is depressed, has headaches, cries spontaneously, loses concentration at work easily, and has trouble sleeping. Her continuing emotional scars include her inability to share

the gruesome events with her family, with whom she is very close, because it would "just break their heart[s]."

Private First Class GR's terror that night is best captured on the 911 audio tape when she reported CM's abduction. She was in hysterical fear for her cousin and was unable to answer simple questions or follow easy directions. In addition to the personal pain of the attack, PFC GR experiences recurring headaches and is reminded of the attack whenever she looks in the mirror and sees the scar on her face. She's reminded not so much of her own ordeal, but the guilt and pain she feels for her cousin, CM. Private First Class GR testified that CM was an outgoing girl before the attack, but now she is withdrawn and suffers from mood swings. She testified that, when CM cries, "It breaks my heart, you know, cause I can't take that pain away. I can't take away what happened to her, and I can't take away that it was my fault that she was standing out there. I can never take that day back." She said she does not like to sleep because she does not "like the dreams, the nightmares." Finally, PFC GR stated that she is not as proud as she once was to wear the uniform and that she no longer plans to re-enlist because of the appellant's attacks that evening.

AM and her father described their emotional devastation endured immediately following the attack. Beyond the immediate impact, AM testified to the continuing effects on her from the attack, such as experiencing "reruns of [the attack] in [her] head," her fear of being alone, and her fear for the other neighborhood children. AM's father summarized the overall impact by testifying that his daughter had been "robbed of her childhood."

As for the character of the appellant, his service records reflect that he enlisted in the Army in November 1995, and was twenty-one-years-old at the time of trial. During the sentencing phase of the trial, the defense called Sergeant (SGT) Workman, the appellant's former first-line supervisor, who testified that the appellant was a knowledgeable tank driver. The appellant was SGT Workman's "right-hand man" who trained new soldiers assigned to their tank. Sergeant

Workman trusted the appellant to train new personnel and to take charge in his absence. He characterized the appellant as a "good soldier" who was also a "very good father and a decent husband from what [he had] seen." On cross-examination, SGT Workman admitted to counseling the appellant for having "an attitude," and he acknowledged that the crimes of which the appellant was convicted were inconsistent with being a good soldier "24/7."

The appellant's wife, a civilian, testified that she had known her husband since they were fifteen-years old, and that they had been married more than two-and-one-half years. They had a daughter, for whom the appellant had extreme affection. She described their marriage as "just fine," with no difficulties. Her husband liked the Army, and they both planned "to take college for officer's candidate [sic]."

In an unsworn statement, the appellant stated that he joined the Army directly after high school. He was serving in his first assignment since basic training, initially as the first sergeant's driver and then with duty as an armored crewman. According to the appellant, being the first sergeant's driver "was all right," but he encountered unspecified "trouble." As far as going to the field, he testified that "I wouldn't say I enjoyed going to the field, but it wasn't that bad." The appellant confirmed his wife's testimony that he planned to go to college, try for a ROTC commission, and make the Army a career. He stated that his wife and daughter were his only family in the area, and that he was close to his daughter. He responded in the affirmative when asked if he respected the members' decision to convict him, even though he might not agree with it. When given an opportunity to say something else to the members about his situation, the appellant declined.

### 2. Sentence Comparison

■ Although we agree that there is a high disparity between the appellant's sentence to confinement for life and SPC Benton's sentence to confinement for thirty months, the disparity is rationally based upon the relative culpability of the coactors, the significantly different findings of guilty,

and the differences in the mitigation evidence presented in the two cases.

Most compelling to our conclusion is the nature and number of the offenses of which each coactor was convicted, the level of their involvement, and ultimately the degree of their individual culpability. Although both the appellant and SPC Benton participated together in the crimes against the victims, there were significant differences between their involvement, as reflected in the guilty findings in each case.

For his part, SPC Benton faced a life sentence based upon his conviction of forcible sodomy and kidnapping of one victim. The appellant, on the other hand, was convicted of victimizing three different women in thirteen specifications, seven of which individually carried a maximum punishment of confinement for life (three rapes, three forcible sodomies, and one kidnapping).

Specialist Benton drove the car as the two offenders looked for girls that night, but it was the appellant who exited the car and grabbed AM, forcing her to pull out of her sweater and run into traffic for help. Later, as they both randomly searched for another victim, it was the appellant who got out of the car with his pistol in hand, grabbed CM, and smashed PFC GR across the face with his pistol. It was the appellant who threw CM into the car, pointed his loaded gun at her, ordered her to disrobe, and sodomized and raped her. It was the appellant who pulled her into the woods and ordered her to sodomize SPC Benton. When SPC Benton left, that ended his participation in the brutalities perpetrated upon these victims. The appellant, however, raped CM again; he threatened to kill her friends; he sodomized her again; and he raped her yet a third time.

Considering the totality of the evidence and the offenses of which the two offenders were convicted, it is obvious to us that the nature and seriousness of the appellant's crimes, his level of involvement, and his degree of culpability substantially exceeded that of his coactor. On this basis alone, we hold there was a rational basis for the disparate sentences.

The rational basis for disparate sentences is bolstered by the differences in the mitigation evidence. We would characterize the appellant's mitigation evidence as weak. Basically, the evidence painted a picture of an average, perhaps less than average, soldier. Despite some unspecified problems as the first sergeant's driver, he was a knowledgeable tank crewman who was trusted by his supervisor. The appellant's wife thought he was a good husband and father, as did his supervisor. The appellant loves his daughter. On the other hand, the appellant expressed no remorse or concern for the welfare of his victims. We understand that his attorney may have wished to avoid comments amounting to a concession of guilt, but normally appellants are capable of expressing in unsworn statements their regret for the effects on victims without admitting guilt.

Specialist Benton's mitigation evidence was much stronger. In presenting evidence of good duty performance, his platoon sergeant testified that SPC Benton had "excellent potential for rehabilitation" and that he would take him back as his tank driver. Specialist Benton's father testified about the positive upbringing he and his wife provided their son, and Mr. Benton read an impassioned letter from his wife who was unable to make the trip for her son's court-martial. In his unsworn statement, SPC Benton repeatedly expressed his remorse, apologized to his victims, and broke down on the witness stand as he expressed his sorrow for his crimes against CM.

Based on the nature and seriousness of the offenses, the character of the appellant, and a comparison of the appellant's sentence to SPC Benton's sentence, we hold that the appellant's sentence was not inappropriately severe.

The remaining assignment of error and matters submitted personally by the appellant are without merit.

Accordingly, the findings of guilty and the sentence are affirmed.

Judge CHAPMAN and Judge JOHNSON concur.