# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
KERN, ALDYKIEWICZ, and MARTIN
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Sergeant First Class CALVIN J. DAVENPORT**
**United States Army, Appellant**

ARMY 20081102

Headquarters, 4th Infantry Division (Mechanized) (trial)
Headquarters, Fort Carson (*DuBay* Hearing)
Jeffery R. Nance, Military Judge (arraignment)
Edward J. O'Brien, Military Judge (motions & trial)
Mark A. Bridges, Military Judge (*DuBay* Hearing)
Lieutenant Colonel Tania M. Martin, Staff Judge Advocate (trial)
Colonel John S.T. Irgens, Staff Judge Advocate (*DuBay* Hearing)

For Appellant: Colonel Mark Tellitocci, JA; Lieutenant Colonel Jonathan F. Potter, JA; Captain Jennifer A. Parker, JA; Lieutenant Colonel D. Linden Barber, JA (on brief).

For Appellee: Colonel Michael E. Mulligan, JA; Major Amber J. Williams, JA; Major Sara M. Root, JA; Captain Kenneth W. Borgnino, JA (on brief).

18 April 2013

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

ALDYKIEWICZ, Judge:

A military judge, sitting as a general court-martial, convicted appellant, contrary to his pleas, of four specifications of conspiracy, seven specifications of extortion, and two specifications of bribery in violation of Articles 81, 127, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 927, 934 (2006) [hereinafter UCMJ]. Appellant was sentenced to a bad-conduct discharge, confinement for two years, and reduction to the grade of E-1. At action, the convening authority

approved the sentence as adjudged except for the period of confinement, approving only one year of confinement.[1]

This case is before this court for review under Article 66, UCMJ.  Appellant raises six assignments of error, in addition to personally submitting matters pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).  We will discuss four of these issues below, to include one alleged in appellant's *Grostefon* matters.  Of the issues discussed, we ultimately conclude appellant's allegations challenging the sufficiency of two of his seven extortion convictions have merit, and although not rising to the level of a due process violation, the post-trial processing of appellant's case warrants relief.  In addition, although not raised by appellant, we find two Article 134, UCMJ, specifications are defective in light of *United States v. Fosler*, 70 M.J. 225 (C.A.A.F. 2011), and *United States v. Humphries*, 71 M.J. 209 (C.A.A.F. 2012).[2]  Accordingly, we will take appropriate action in our decretal paragraph, addressing the modified findings as well as appellant's sentence in light of the modified findings of guilt and the post-trial delay.

## I.  BACKGROUND

On 1 December 2007 appellant was assigned to Bravo Company, 94th Brigade Support Battalion, 4th Brigade Combat Team, 10th Mountain Division (Light), a unit task organized to 4th Infantry Division (Mechanized) and Multi-National Division – Baghdad.  Appellant, his company, and his battalion headquarters were located on Forward Operating Base (FOB) Rustamiyah, Iraq.  Appellant's company first sergeant (1SG) and battalion command sergeant major (CSM) were 1SG Patrick A. Faust and CSM Ofelia Webb, respectively.  During all times relevant to appellant's convictions, appellant served as the force protection noncommissioned officer-in-charge (NCOIC) for FOB Rustamiyah.

Between the latter part of December, 2007 and the early part of January, 2008, CSM Webb, along with 1SG Faust and appellant, decided to open and operate the "Hair Zone" and "Razor Edge" on FOB Rustamiyah, a hair salon and barbershop respectively.  The plan involved furnishing both the salon and barbershop with locally acquired property and using Iraqi and third-country nationals as employees to provide the hair care services.  Consistent with their plan, a list of equipment and

---

[1] Neither the action nor any related post-trial documentation, such as the staff judge advocate's post-trial recommendation or addendum thereto, provides any rationale for the one-year reduction in confinement.

[2] Our superior court's decisions in *Fosler* and *Humphries* were issued after appellant submitted his brief to this court, and we did not order any supplemental briefs.

furnishings necessary to open both was provided to Mr. Hasseeb Muhammadatta Khalil Al-Sawad, also known as "Bob Villa," a local vendor operating on the FOB. Mr. Al-Sawad provided appellant, 1SG Faust, and CSM Webb with property having an estimated value of $4,680.00,[3] property Mr. Al-Sawad delivered to the Hair Zone and Razor Edge. Mr. Al-Sawad believed he was providing the property to the three on credit with an expectation that payment would be made at a later date. Sometime after delivery, Mr. Al-Sawad was confronted by appellant and 1SG Faust regarding payment for the delivered property. Appellant, commenting on monies Mr. Al-Sawad made on an unrelated government contract which he obtained at least in part through appellant's efforts, asked Mr. Al-Sawad, as testified to by Mr. Al-Sawad, "what shall you give us from the profit that you made from this contract . . . ." Appellant then said "you give us all the barbershops--all the furniture of the barbershop and beauty shop as free." Mr. Al-Sawad was then directed to alter a receipt related to the previously delivered property, directing that he inflate the value of the property and note that payment was made in full. Mr. Al-Sawad did as appellant and 1SG Faust directed because "they are big people" of "high rank." At the time Mr. Al-Sawad was directed to alter the receipt he did so believing that failure to comply would result in his permanent removal from FOB Rustamiyah, a belief he reached after appellant told him they had already kicked one barber and two female laundry employees off of the FOB and after noting other vendors will be "kicked out." Faced with the alternative of permanent removal from the FOB, Mr. Al-Sawad complied with appellant's and 1SG Faust's directive.

The activities of appellant, 1SG Faust, and CSM Webb at the Hair Zone and Razor Edge extended beyond simply opening and equipping each facility. The three exercised some managerial control over the operations' ten employees, three of which worked at Hair Zone and seven at Razor Edge. They decided, as a condition of employment, that each employee would pay them a monthly fee of $300.00. The fee requirement was enforced by threatening the employees with the loss of their jobs if the fee was not paid, a threat conveyed by either appellant, 1SG Faust, or an interpreter acting at their behest. For many of the employees, if not all, they believed that the threatened loss of employment also meant removal from the FOB, which for some posed a serious threat of injury considering the environment at the time and the duration of the employee's involvement with United States forces.

In addition to appellant's Hair Zone and Razor Edge activities, appellant used his position of authority and influence, along with 1SG Faust, to affect cable television and internet services provided to the soldiers and civilians residing on

---

[3] Among the items provided were seven barber shop mirrors, seven barber shop shelves, three couches, three barber chairs, a shampoo chair, two shampoo stand sinks, a hair dryer, an office chair, a large mirror, and barber accessories.

FOB Rustamiyah. Sometime around January 2008, 1SG Faust met with Mr. Sanar Farid Dehard, an employee of Netgate, a private company engaged in the business of providing cable television and internet services. During the meeting, 1SG Faust suggested he could take care of Mr. Dehard, inquiring of Mr. Dehard what he, 1SG Faust, would receive in return. The next day, appellant and 1SG Faust met with Mr. Dehard, providing him with a yellow piece of paper with the figure $20,000 written on it. Mr. Dehard asked what $20,000.00 covered. In appellant's presence, 1SG Faust indicated $20,000.00 got Netgate support, more internet business from soldiers, a place on the FOB for the business, and another FOB badge which provided a Netgate employee unescorted access on the FOB. When Mr. Dehard identified the building he wanted for Netgate, appellant responded, "it's yours." Considering the amount and his limited role in the business, Mr. Dehard told appellant and 1SG Faust he needed to discuss the $20,000.00 with his boss. When the $20,000.00 was not accepted by Mr. Dehard immediately, appellant sought a counteroffer, asking Mr. Dehard how much Netgate could provide "right now." Mr. Dehard's response was that he couldn't provide anything "right now" because the decision belonged to his boss.

The following day, after having discussed the $20,000.00 with his boss, Mr. Dehard met with 1SG Faust. Mr. Dehard noted his boss approved the pay-off but that they couldn't pay all at once. First Sergeant Faust, prior to closing the deal, told Mr. Dehard he needed to call his "partner," who 1SG Faust identified as appellant. Consistent with the negotiated deal, Mr. Dehard paid 1SG Faust $20,000.00 to operate Netgate's internet business on FOB Rustamiyah. Having concluded the deal for internet services, appellant and 1SG Faust brokered a second deal with Netgate, offering Netgate the opportunity to operate a cable television service on FOB Rustamiyah. Like the internet service, the initial suggested price for their support was $20,000.00, however, Mr. Dehard negotiated the price down from $20,000.00 to $10,000.00.

Consistent with the negotiated internet and cable services deals noted above, Mr. Dehard paid 1SG Faust $30,000.00 so that Netgate could operate internet and cable television services on FOB Rustamiyah, providing access to both, for a fee, to the soldiers and civilians residing on the FOB. When Mr. Dehard noted that 1SG Faust had a lot of money, 1SG Faust responded that he was "an honest person" and that he shared the monies "50/50" with appellant, his partner.

## II. LAW AND DISCUSSION

Appellant raises four issues worthy of discussion: (1) whether appellant's record of trial is "substantially non-verbatim or incomplete" preventing approval of any sentence that includes confinement greater than six months or a punitive discharge; (2) whether the evidence is legally and factually sufficient to sustain appellant's convictions; (3) whether appellant was denied due process due to the

delayed post-trial processing of his case; and (4) whether appellant's sentence is highly disparate when compared to one of his two co-conspirators. Additionally, although not raised, we find both specifications alleging bribery in violation of Article 134, UCMJ, fail to state offenses in light of *Fosler* and *Humphries*. We will discuss each of the foregoing issues in turn.

## A. VERBATIM AND COMPLETE RECORD OF TRIAL

Appellant's trial ended on 11 December 2008, resulting in a 953-page record of trial (ROT). Authentication of the ROT was completed on 2 June 2009. The record lacks any evidence documenting that trial or defense counsel conducted any errata review. Notwithstanding review by the trial judge, the record was authenticated without the testimony on the merits of a government witness, Sergeant (SGT) MS. The authenticated record reveals that SGT MS was called as a government witness, and although recorded by the court reporter, his testimony was not transcribed into the verbatim record of trial. The omission of SGT MS's testimony from the record went unnoticed throughout the post-trial processing of appellant's case and was first discovered by appellate defense counsel on appeal before this court.[4]

In his 30 July 2010 pleadings, appellant alleged, *inter alia*, that the missing testimony constitutes a substantial omission from the record of trial rendering it incomplete under Article 54(c)(1)(A), UCMJ, and non-verbatim under Rule for Courts-Martial [hereinafter R.C.M.] 1103(b)(2)(B), thus limiting the sentence that can be approved. On 31 October 2011, we ordered a post-trial hearing pursuant to *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967) to provide an opportunity to reconstruct the testimony of SGT MS, determine whether the omission of his testimony is "substantial" if it cannot be reconstructed, and determine whether the government has rebutted the presumption of prejudice that would attend a substantial omission. *United States v. Davenport*, ARMY 20081102 (Army Ct. Crim. App. 31 Oct. 2011) (order). *See, e.g.*, *United States v. Gaskins*, 69 M.J. 569, 571 (Army Ct. Crim. App. 2010) (en banc) ("When faced with an incomplete record, this court may order a new trial, order reconstruction of the record, or simply approve a sentence that meets the mandates of R.C.M. 1103, Article 19, and Article 54."); *United States v. Church*, 23 M.J. 870, 871 (A.C.M.R. 1987) (post-trial *Dubay* hearing authorized to ascertain the subject matter of a

---

[4] The government conceded the omission of the testimony from the verbatim record of trial and advised this court, by affidavit from the chief of justice, that the computer on which the testimony was recorded by the court reporter in Iraq was reimaged or wiped subsequent to redeployment preventing recovery of the original, recorded data.

sidebar conversation and whether its reconstruction was necessary and practicable); *United States v. Williams*, 14 M.J. 796, 801 (A.F.C.M.R. 1982) (post-trial *Dubay* hearing authorized to reconstruct missing exhibit).

On 2 April 2012, the *DuBay* hearing in this case was conducted. At this hearing, the military judge made, *inter alia*, the following findings of fact regarding SGT MS's testimony:

> Sergeant [MS]'s testimony mostly related to the "money laundering" charges . . . of which the appellant was found not guilty. Sergeant [MS] testified that in February 2008 the appellant approached him on FOB Rustamiyah, Iraq, and asked him to send money "home." Sergeant [MS] testified that he agreed to do so. Sergeant [MS] testified that the appellant asked him to do this because he (the appellant) was going on leave to the United States. . . . Sergeant [MS] testified that he then "wired" that money from a Western Union in the Post Exchange . . . .
>
> Sergeant [MS] was also asked whether he was aware of any threats made by the appellant and whether the appellant had ever taken money or property from "local nationals." Sergeant [MS] testified that he was not aware of any such threats made by appellant or of any property or money taken by the appellant from "local nationals."
>
> . . . .
>
> There is some evidence that objections were made by the defense counsel during the testimony of [SGT MS], but there is no evidence to establish what those objections were. Whatever the objections were, they were sustained by the military judge. As such, there is no evidence to suggest that any of the judge's rulings on defense counsel objections adversely affected the appellant's rights at trial.

Article 54(c)(1)(A), UCMJ, requires a "complete record of the proceedings and testimony" for any general court-martial "in which the sentence adjudged includes death, a dismissal, a discharge, or (if the sentence adjudged does not include a discharge) any other punishment which exceeds that which may otherwise be adjudged by a special court-martial." Rule for Courts-Martial 1103(b)(2)(B)(i) requires a verbatim transcript in a general court-martial when "[a]ny part of the sentence adjudged exceeds six months confinement, forfeiture of pay greater than

6

two-thirds pay per month, or any forfeiture of pay for more than six months or other punishments that may be adjudged by a special court-martial."

Although verbatim literally means word for word, R.C.M. 1103(b)(2)(B) and Article 54, UCMJ, envision a record that is "'substantially verbatim.'" *United States v. Lashley*, 14 M.J. 7, 8 (C.M.A. 1982) (quoting *United States v. Gray*, 7 M.J. 296, 297 (C.M.A. 1979)). Whether an omission of testimony from a record of trial is "substantial" is analyzed on a case-by-case basis. *United States v. Abrams*, 50 M.J. 361, 363 (C.A.A.F. 1999). Insubstantial omissions from a record of trial "'do not affect its characterization as a verbatim transcript.'" *United States v. McCullah*, 11 M.J. 234, 237 (C.MA.1981) (quoting *United States v. Boxdale*, 22 U.S.C.M.A. 414, 415, 47 C.M.R. 351, 352 (1973)) (internal citations omitted). Likewise, "[i]nsubstantial omissions from a record of trial do not raise a presumption of prejudice or affect that record's characterization as a complete one." *United States v. Henry*, 53 M.J. 108, 111 (C.A.A.F. 2000). Missing testimony amounts to a substantial omission when it is "related directly to the sufficiency of the Government's evidence on the merits." *Lashley*, 14 M.J. at 9.

In this case, the government was unable to obtain or adequately reconstruct the exact testimony of SGT MS. Nevertheless, it is clear from the military judge's *DuBay* findings that SGT MS's testimony was on the merits and only related to the two money laundering specifications[5] of which appellant was acquitted.[6] Sergeant MS had no information relevant to any offense of which appellant was convicted. Thus, "not one fact of substance or materiality to a legal or factual issue is missing from [appellant's] transcript." *United States v. Nelson*, 3 U.S.C.M.A. 482, 487, 13 C.M.R. 38, 43 (1953). "The totality of the omissions in this record becomes so unimportant and so uninfluential when viewed in the light of the whole record, that it approaches nothingness." *Id*. Accordingly, we find the record in appellant's case is both substantially verbatim and complete for appellate review purposes.[7]

---

[5] These money laundering specifications are Specification 3 of Additional Charge IV (as redesignated) and Specification 4 (as renumbered) of Additional Charge IV (as redesignated).

[6] We adopt in full the *DuBay* military judge's findings of fact as our own.

[7] While neither briefed by the parties nor the subject of this court's ordered *DuBay* hearing, we note that Prosecution Exhibit (Pros. Ex.) 23 is also missing from the record. However, a review of the record leads this court to confidently conclude that Pros. Ex. 23 is a photograph of personal property found in appellant's living quarters, coinciding with the evidence noted on Pros. Ex. 31, a corresponding evidence custody document. Admitted without objection, Pros. Ex. 23 pertains to

(continued . . .)

B.  LEGAL AND FACTUAL SUFFICIENCY

Appellant challenges the legal and factual sufficiency of his convictions in their entirety.  With regard to Specifications 1 and 2 of Charge I (conspiracy offenses in violation of Article 81, UCMJ), and Specifications 1 and 2 of Charge II (extortion offenses in violation of Article 127, UCMJ), appellant's allegations have some merit, impacting the findings of guilt for those specifications.  We will discuss each of these specifications separately below.

Article 66(c), UCMJ, provides that a Court of Criminal Appeals "may affirm only such findings of guilty . . . as it finds correct in law and fact."  In performing our duty, we must conduct a de novo review of legal and factual sufficiency.  *United States v. Gilchrist*, 61 M.J. 785, 793 (Army. Ct. Crim. App. 2005) (citing *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002)).  The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt."  *United States v. Lubasky*, 68 M.J. 260, 263 (C.A.A.F. 2010) (citations omitted).  The test for factual sufficiency is "whether, after weighing the evidence of record and making allowances for not having personally observed the witnesses, [this court is] convinced of appellant's guilt beyond a reasonable doubt."  *Gilchrist*, 61 M.J. at 793 (citing *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)).  This review for factual sufficiency "involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses."  *Washington*, 57 M.J. at 399.  "[T]o sustain appellant's conviction, we must find that the government has proven all essential elements and, taken together as a whole, the parcels of proof credibly and coherently demonstrate that appellant is guilty beyond a reasonable doubt."  *Gilchrist*, 61 M.J. at 793 (citing *United States v. Roukis*, 60 M.J. 925, 930 (Army Ct. Crim. App. 2005)).

---

(. . . continued)

Specification 1 of Additional Charge III (as redesignated), an extortion offense of which appellant was acquitted.  Like the testimony of SGT MS, we find the omission of Pros. Ex. 23 from the record to be insubstantial.  *See United States v. Carmans*, 9 M.J. 616, 621 (A.C.M.R. 1980) (missing photos of stolen stereo equipment in larceny case deemed insubstantial where record otherwise adequately described and identified the stolen property at issue).

*1. Conspiracy to Commit Extortion and Extortion of Mr. Adb Al Zaha*

As initially pleaded, Specification 1 of Charge I alleged appellant conspired with 1SG Faust and CSM Webb to extort six named individuals:  "Mr. Hamza Kaloof Alwan, Mr. Adb Al Zaha, Mr. Yacoub Slawah, Ms. Genon Husayn, Mr. Muayaid Sabah Sahkir, Mr. Naduk Hameed Ghati."  After excepting out one of the six named victims, Mr. Hamza Kaloof Alwan, the military judge convicted appellant of conspiring to extort the remaining five named individuals, to include a Mr. Adb Al Zaha.  Further, Specification 2 of Charge II, of which appellant was also convicted, alleges that appellant extorted a Mr. Adb Al Zaha.  However, we find the evidence presented at trial failed to establish that appellant, or his co-conspirators, ever extorted anyone named Mr. Adb Al Zaha.

At trial the government called twenty-five merits witnesses, two of whom were identified as Mr. Wassim Al Zahra and Mr. Salam Al Zahra.  Mr. Wassim Al Zahra testified that he worked in the Hair Zone and that his brother, Mr. Salem Adb Al Zahra, worked in the Razor Edge.  Mr. Wassim Al Zahra also testified that he and his brother paid $300.00 per month as a condition of employment, testifying in relevant part, as follows:

> Q.  Mr. Al Zaha, who are the barbers in the barber shop
> that paid money?  Can you name them please?
>
> A.  Him, Wassim, Genon, Husayn in the Hair Zone.
>
> Q.  Okay.  What about the Razors Edge?
>
> A.  His brother Salem, Slawah, and Ali, and Hamza,
> Naduk, and Muayaid, and Mudafar, six barber.[8]
>
> . . . .
>
> Q.  And Salem Al Zahra?
>
> A.  Yes.
>
> Q.  His name isn't Adb Zahra?
>
> A.  Salem Adb Al Zahra.

---

[8] Although the witness ends by stating "six barber," he named three Hair Zone employees and seven (vice six) Razor Edge employees, a fact noted by the military judge when ruling on the defense's R.C.M. 917 motions at the close of the government's case.

Five witnesses later, Mr. Salam Al Zahra testified. Covering less than four pages of record transcript, Mr. Salam Al Zahra never testified that he was the same individual named in the government's charges as Mr. Adb Al Zaha nor did he testify that he was Mr. Wassim Al Zahra's brother.

On appeal, the government argues that the witness who testified, Mr. Salam Al Zahra is in fact Mr. Adb Al Zaha, the victim named in the specification, and therefore, the evidence is factually sufficient. The government notes the court reporter used Al Zaha and Al Zahra interchangeably in the record, and that Mr. Wassim Al Zahra identified his brother as "Salem Adb Al Zahra," the witness who later testified but was identified as Mr. Salam Al Zahra. In support of its position, the government cites to the rule of *idem sonans*.

Literally, *idem sonans* means "sounding the same, regardless of spelling." *Black's Law Dictionary* 813 (9th ed. 2009). The rule of *idem sonans* is a "legal doctrine preventing a variant spelling of a name in a document from voiding the document if the misspelling is pronounced the same way as the true spelling." *Id.* *Idem sonans* is rooted in the concept that one should not gain an advantage based on slight deviations in the spelling of names when they sound alike and more importantly, the evidence supports that the two persons at issue are in fact the same person. The cases cited by the government in their brief, while consonant with this concept, are distinguishable from the facts in appellant's case, thus lending no support for the government's conclusion.

In *United States v. Rushing*, the Army Board of Review found insignificant the difference between a victim's name as pleaded, "Oh Yung Dong," and the name established at trial, "Oh Yoong Dung." *United States v. Rushing*, 1 C.M.R. 328, 334–35 (A.B.R. 1951). In so finding, the Board noted the absence of any objection at trial and the fact that the names are nearly identical:

> No issue was raised at the trial that the person who testified he was assaulted was not the person alleged to have been assaulted. The name was translated, and phonetically the two versions are practically identical. Accordingly, under the rule of idem sonans we deem the variance immaterial, the latter spelling merely amounting to a trivial clerical error[.]

*Id.* (citations omitted). In *United States v. Plummer*, the victim of an assault with a dangerous weapon was pleaded as "Chong Soon Chai," referred to by a defense witness as "Chai Chong Soon," but her actual name was "Chai Chang Sook." *United States v. Plummer*, 1 C.M.R. 351, 356 (A.B.R. 1951), *rev'd on other grounds*, 1 U.S.C.M.A. 373, 3 C.M.R. 107 (1952). In applying the rule of *idem sonans*, the board again noted that the names are nearly identical and that no objections were

made by the appellant. *Id*. *See also*, *United States v. Hunter*, 6 C.M.R. 349, 356 (A.B.R. 1951) (pleadings alleged victim named "Kim Chung Cha" and evidence established victim was named "Kim Chung Ja"); *United States v. Gidley*, 2 C.M.R. 288, 293 (A.B.R. 1951) (case involving approximately two dozen Korean victims and a comparison of the pleadings with the record revealed "minor inconsistencies" such as "Chung Won Chan" instead of "Chung Won Chon" or "Paek Bok Sul" instead of "Pak Bok Sul").

Unlike *Rushing* and *Plummer*, appellant's case involves more than minor inconsistencies with slight deviations in sound and spelling. Specification 1 of Charge I and Specification 2 of Charge II name "Adb Al Zaha," a significantly different name than "Salam Al Zahra." Also, unlike counsel in the cases cited by the government, appellant's defense counsel objected at trial, bringing a motion under R.C.M. 917. While the motion focused primarily on the absence of any threat to Mr. Adb Al Zaha, the defense did note during argument on this motion that no one by the name of Adb Al Zaha testified.[9]

Contrary to the government's position in their brief, Mr. Wassim Al Zahra's testimony that "Salem Adb Al Zahra" is his brother as well as an employee of the Razor Edge adds little clarification to Mr. Adb Al Zaha's identity. The government failed to even confirm that their witness, Mr. Salam Al Zahra, was the brother of Mr. Wassim Al Zahra. Moreover, despite having Mr. Salam Al Zahra on the witness stand, the government did not ask him if he was the victim named in the specification as "Mr. Adb Al Zaha," nor did the government seek to change the specification—a fact made more puzzling by the government's later motion to change the spelling of an individual named in unrelated conspiracy and bribery specifications.[10] The confusion surrounding Mr. Adb Al Zaha is further compounded

---

[9] During the discussion on this R.C.M. 917 motion, the military judge stated, "Okay, halt. I believe there was a witness by that name and I think I asked the government isn't this number thirteen on your witness list." On appeal, the government relies on this statement as support for their argument that Mr. Adb Al Zaha actually testified. However, the government's witness list was not included in the record as an appellate exhibit, and the government did not move to attach it on appeal. Therefore, this court is unable to ascertain who the military judge identified as "number thirteen" on the government's witness list and whether that individual actually testified.

[10] At the close of the government's case, it moved to amend the name of the individual in the conspiracy to commit bribery specifications, Specification 2 and 3 of Charge I, as well as one of the two bribery specifications, Specification 1 of Charge III. (His name also appears in Specification 2 of Charge III, however, the

(continued . . .)

by Mr. Wassim Al Zahra's testimony that the Hair Zone and Razor Edge employed a total of ten individuals. At trial, the government called only six of the alleged employees, leaving four employees unaccounted for. Considering the evidence presented, one very distinct possibility is that Mr. Adb Al Zaha was one of the four Hair Zone and Razor Edge employees not called by the government and not focused on when eliciting testimony regarding appellant's or his co-conspirators' threats. Finally, the government's final argument, that the court reporter used Zaha and Zahra interchangeably in the transcript, is inadequate to explain the foregoing uncertainty. Accordingly, this court declines the government's invitation to use the rule of *idem sonans* to equate Salam Al Zahra with Adb Al Zaha.[11]

On the record before us, the evidence is factually insufficient to support the finding of guilty that appellant conspired to extort or extorted Mr. Adb Al Zaha. As such, the finding of guilty to Specification 1 of Charge I, as it relates to Mr. Adb Al Zaha must be set aside. Furthermore, the finding of guilty to Specification 2 of Charge II must also be set aside.

### 2. *Conspiracy to Commit Bribery*

In Specification 2 of Charge I, appellant was convicted of conspiring with 1SG Faust to commit bribery. The bribery relates to a private company, Netgate, providing television services on FOB Rustamiyah. As written, the specification alleges the service or business was "satellite" linked. The specification also alleges that the actions intended to be influenced by the bribes were "with respect to providing a mechanical satellite television system and awarding an authorization to operate a satellite television business on Forward Operating Base Rustamiyah." Although the record clearly establishes the television service at issue was cable service, the record fails to establish any satellite connection. Additionally, the record is silent with regards to any evidence of "providing a mechanical satellite television system," a fact conceded by the government in its pleadings before this court. As such, the finding of guilty to Specification 2 of Charge I, relating to the word "satellite" and "providing a mechanical satellite television system" is factually

---

(. . . continued)
government failed to realize this, advising the military judge that only Specifications 2 and 3 of Charge I and Specification 1 of Charge III were affected by the motion.)

[11] *Idem sonans* does, however, allow this court to find that "Mr. Wassum Al Zaha," as alleged in Specification 2 of Additional Charge III (as redesignated) is the same individual who testified by the name of "Mr. Wassim Al Zahra." The names are virtually identical and no objection was raised by the defense.

insufficient and must be set aside.  The remaining finding of guilty to the specification as modified is both legally and factually sufficient.

### 3. *Extortion of Mr. Hamza Kaloof Alwan*

In Specification 1 of Charge II, appellant was convicted of extorting Mr. Hamza Kaloof Alwan for money by threatening "to fire him from his job and remove him from Forward Operating Base Rustamiyah, or words to that effect."  However, Mr. Hamza Kaloof Alwan did not testify in appellant's court-martial, and the government failed to elicit testimony from any of the witnesses that did testify about Mr. Hamza Kaloof Alwan and whether he was threatened by appellant or his co-conspirators.  Therefore, we find, and the government concedes, that the evidence of extortion in support of Specification 1 of Charge II is both legally and factually insufficient and must be set aside.[12]

### C.  POST-TRIAL PROCESSING OF APPELLANT'S CASE

We next address appellant's allegation that the post-trial processing of his case resulted in a denial of his right to due process as articulated in *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006).  A brief summary of dates relevant to the resolution of this issue follows:

| Action | Date | Processing Day No. |
|---|---|---|
| Sentence Adjudged | 11 December 2008 | 1 |
| Initial Action on Sentence | 23 June 2009 | 195 |
| Record Docketed by ACCA | 14 August 2009 | 247 |
| *DuBay* Hearing Ordered | 31 October 2011 | 1055 |
| *DuBay* Hearing Completed | 2 April 2012 | 1209 |
| *DuBay* Record Completed | 1 June 2012 | 1269 |
| *DuBay* Record Rcvd by ACCA | 13 June 2012 | 1281 |

A review of the above reveals that all three of *Moreno*'s post-trial processing phases have exceeded the standards articulated by our higher court, raising a presumption of unreasonable post-trial delay.  *Moreno*, 63 M.J. at 142.  From completion of the trial until initial action took 172 days,[13] exceeding the 120-day

---

[12] We note the military judge similarly concluded that the evidence did not establish a conspiracy to extort Mr. Hamza Kaloof Alwan, and therefore, excepted him out as one of the named victims in Specification 1 of Charge I.

[13] The chronology sheet in the record notes that there were thirty-three days of R.C.M. 1105 delay, however, those days were computed using a beginning date of

(continued . . .)

standard. It took 52 days to docket the record of trial with this court following the convening authority's action, which exceeds the 30-day standard. And, even excluding time attributable to appellate defense counsel and time required to complete the *DuBay* hearing, the time from docketing of the record until completion of our appellate review exceeds *Moreno*'s eighteen-month standard.

Although the processing of appellant's case is presumptively unreasonable, "[w]hether the post-trial processing rises to the level of a due process violation, however, hinges on application and analysis of the four factors articulated in *Barker v. Wingo*[, 407 U.S. 514 (1972)]: '(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice,' with no one factor being dispositive." *United States v. Arias*, 72 M.J. 501, 504 (Army Ct. Crim. App. 2013) (quoting *Moreno*, 63 M.J. at 135–136). Here, the first three *Barker* factors favor appellant; however, the fourth factor does not—appellant was not prejudiced as a result of the post-trial processing of his case. Consequently, in weighing all four factors, we find no violation of appellant's post-trial due process rights.

Our review, however, does not end here. Article 66(c), UCMJ, imposes an obligation on this court to assess the appropriateness of appellant's sentence in light of presumptively unreasonable and unexplained delay in the post-trial processing of his case. *See generally United States v. Toohey*, 63 M.J. 353, 362–63 (C.A.A.F. 2006); *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002); *United States v. Ney*, 63 M.J. 613, 616–17 (Army Ct. Crim. App. 2010). In consideration of the delay associated with the post-trial processing of appellant's case, during each post-trial phase as well as cumulatively, we find a two-month reduction in the sentence to confinement is warranted.

## D. SENTENCE DISPARITY

Appellant's *Grostefon* submission states, *inter alia*, "Comparison of Sentences. For her role in the alleged conspiracy, Command Sergeant Major Webb was reduced to E-6 and allowed to retire." While not captioned as an allegation of

---

(. . . continued)
16 April 2009, the date of the staff judge advocate's recommendation. However, ten of the thirty-three days are the initial ten days afforded an appellant to submit matters prior to action. *See* R.C.M. 1106(f)(5). Therefore, at best, only twenty-three days are excludable as defense delay.

sentence disparity, appellant's allegation is just that and will be reviewed as such by this court. This allegation warrants discussion but no relief.[14]

Sentence comparison, unlike sentence appropriateness, is required only in "those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases." *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999) (quoting *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A.1985)). The burden is on the appellant seeking relief to show that his or her case is "closely related" to the cited cases and that the sentences are "highly disparate." *Id.* Once met, the burden shifts to the government to show a rational basis for the disparity. *Id.* In deciding this issue, we took judicial notice of the records of trial in the general courts-martial of appellant's co-conspirators, First Sergeant Patrick A. Faust (Docket No. ARMY 20090080) and Command Sergeant Major Ofelia Webb (Docket No. ARMY 20090047). *See United States v. Smith*, 56 M.J. 653, 659 n.7 (Army Ct. Crim. App. 2001) (collecting cases establishing a service court's authority to judicially notice other records or portions thereof in exercising its Article 66, UCMJ, authority).

In the case of 1SG Faust, we find appellant's and 1SG Faust's sentences are not highly disparate. Having been convicted of offenses similar to that of appellant,[15] 1SG Faust was sentenced to a bad-conduct discharge, confinement for thirty months, and reduction to the grade of E-1. At action, the convening authority approved only twenty-eight months of confinement, but otherwise approved the sentence as adjudged. Appellant's approved sentence, on the other hand, includes a bad-conduct discharge, confinement for one year, and reduction to the grade of E-1. Consequently, appellant fails to meet his burden of showing that his sentence is highly disparate when compared with 1SG Faust's sentence.

---

[14] Appellant's *Grostefon* submission only mentions CSM Webb when comparing sentences; however, this court considered the findings and sentences of both CSM Webb and 1SG Faust, both co-conspirators with appellant, when comparing sentences.

[15] First Sergeant Faust was convicted of conspiracy to commit extortion, conspiracy to commit bribery (two specifications), disobeying a superior commissioned officer, violating a lawful general order, larceny, extortion (four specifications), and bribery (two specifications), in violation of Articles 81, 90, 92, 121, 127, and 134, UCMJ. With the exception of the larceny, disobedience, and general order convictions, 1SG Faust's convictions are near mirror images of those offenses for which appellant stands convicted. Appellant, however, was convicted of one additional specification of conspiracy to commit extortion and three additional extortion specifications.

As appellant points out in his *Grostefon* submission, however, CSM Webb was only sentenced to one month of confinement and reduction to the grade of E-6, a sentence that allowed her to retire. Nevertheless, we conclude that, even assuming appellant's and CSM Webb's sentences are highly disparate, there is a rational basis for the disparity when considering the "relative culpability of the coactors [and] the significantly different findings of guilty." *United States v. Ransom*, 56 M.J. 861, 867 (Army Ct. Crim. App. 2002). "Most compelling to our conclusion is the nature and number of the offenses of which each coactor was convicted, the level of their involvement, and ultimately the degree of their individual culpability." *Id.* at 868 (finding a rational basis for the disparity between one accused's sentence to confinement for life and another's sentence to confinement for thirty months). Unlike appellant and 1SG Faust, both of whom were convicted of no less than two bribery specifications, three conspiracy specifications, and four extortion specifications, CSM Webb was convicted of far less, having been convicted of only seven larceny specifications, stealing $300.00 per person from seven named victims. While appellant, 1SG Faust, and CSM Webb were co-conspirators in the scheme to extort the barbers on FOB Rustamiyah, CSM Webb was not criminally linked to the conspiracy between appellant and 1SG Faust to solicit $30,000.00 in bribes from Netgate. Thus, considering the offenses of which each was convicted, appellant faced a maximum sentence to confinement of thirty-nine years, 1SG Faust faced a maximum of thirty-one years, and CSM Webb faced a maximum of only three years and six months. Moreover, CSM Webb pleaded guilty, whereas appellant and 1SG Faust were convicted after fully contested courts-martial. Therefore, we conclude there is a rational basis for any disparity between appellant's sentence and CSM Webb's sentence.

### E. FAILURE TO ALLEGE THE ARTICLE 134, UCMJ, TERMINAL ELEMENTS

Specification 1 and 2 of Charge III both allege bribery under the provisions of Article 134, UCMJ. *See MCM*, 2008, pt. IV, ¶ 66. Specification 1 alleges bribery related to television services on FOB Rustamiyah and Specification 2 relates to internet services on FOB Rustamiyah. Both specifications, generally speaking, allege appellant, along with 1SG Faust, wrongfully asked for, accepted, and received monies to influence their official actions related to Netgate and Netgate's delivery of television and internet services to soldiers and civilians residing on FOB Rustamiyah. Neither specification alleges the terminal elements of prejudice to good order and discipline or service-discrediting conduct. Pursuant to *United States v. Fosler*, 70 M.J. 225 (C.A.A.F. 2011), *United States v. Ballan*, 71 M.J. 28 (C.A.A.F. 2012), and *United States v. Humphries*, 71 M.J. 209 (C.A.A.F. 2012), it was error to omit the terminal elements from this specification.

Under the totality of the circumstances in this case, we conclude that the omission of the terminal elements from the bribery specifications materially

prejudiced appellant's substantial right to notice. UCMJ art. 59(a); *Humphries*, 71 M.J. at 215 (relief warranted upon a showing that "the Government's error in failing to plead the terminal element of Article 134, UCMJ, resulted in material prejudice to [appellant's] substantial right to notice."). The record fails to satisfactorily establish notice of the need to defend against a terminal element and the evidence was controverted as to at least one clause of Article 134, UCMJ. *See Humphries*, 71 M.J. at 215–16 (holding that to assess prejudice, "we look to the record to determine whether notice of the missing element is somewhere extant in the trial record, or whether the element is 'essentially uncontroverted'" (citing *United States v. Cotton*, 535 U.S. 625, 633 (2002); *Johnson v. United States*, 520 U.S. 461, 470 (1997))). Accordingly, we must set aside the findings of guilty to Specifications 1 and 2 of Charge III and Charge III.

### F. SENTENCE REASSESSMENT AND SENTENCE APPROPRIATENESS

As discussed above, this court has determined that the findings of guilty relating to six specifications require modification or set aside. As a result, the maximum period of confinement in appellant's case is reduced from 39 to 23 years; therefore, we must consider whether reassessment without a rehearing is possible, and if so, whether appellant's sentence must be reduced. *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986); *United States v. Moffeit*, 63 M.J. 40, 43 (C.A.A.F. 2006) (Baker, J., concurring).

In this case, we can be "reasonably certain as to the severity of the sentence that would have resulted in the absence of the error," *Sales*, 22 M.J. at 307 n.3, and therefore, we will reassess the sentence at our level. In performing our reassessment, we conclude that the modified findings do not warrant a reduction of appellant's sentence. Although setting aside and dismissing four specifications reduces the maximum period of confinement by 16 years, the gravamen of appellant's misconduct is unchanged. Appellant, while serving as the force protection NCOID on a FOB in a combat zone, conspired with two other senior noncommissioned officers to use his position of authority and influence for monetary gain and to extort local civilians. The 16 year reduction in authorized confinement, in our opinion, does not significantly change the sentencing landscape, especially when considering that the evidence related to both set-aside bribery specifications, accounting for a ten-year reduction in confinement exposure, was independently admissible, both on the merits and on sentencing as relating to the two conspiracy to commit bribery specifications.

Appellant's actions in conspiring with 1SG Faust and CSM Webb to extort civilians, the extortion of said civilians, and his conspiracy with 1SG Faust to seek $30,000.00 in bribes related to television and internet services on FOB Rustamiyah would no doubt have resulted in the sentence adjudged by the military judge

notwithstanding the reduction in authorized confinement from 39 to 23 years. Having found that the military judge's announced sentence would have been unchanged by the modified findings and related reduction in maximum confinement authorized, there can be no doubt that appellant's sentence would have been no less severe than that approved by the convening authority: a bad-conduct discharge, confinement for one year, and reduction to the grade of E-1.

We next turn to the appropriateness of appellant's sentence, *Sales*, 22 M.J. at 307–08, which is reviewed de novo, *United States v. Bauerbach*, 55 M.J. 501, 504 (Army Ct. Crim. App. 2001) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). In determining sentence appropriateness, an exercise of a service court's Article 66, UCMJ, authority, the court looks to the character of the offender, the nature and seriousness of the offenses, and the entire record of trial. *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982); *United States v. Ransom*, 56 M.J. 861, 865 (Army Ct. Crim. App. 2002); *United States v. Triplett*, 56 M.J. 875, 885 (Army Ct. Crim. App. 2002). In this case, we find the sentence, as reduced by two months for delay associated with the post-trial processing of appellant's case, appropriate.

### III. CONCLUSION

On consideration of the entire record, the assigned errors, the briefs submitted by the parties, the matters personally submitted by appellant pursuant to *Grostefon*, and in light of *Humphries*, the following action is taken regarding the findings.

The findings of guilty to Specifications 1 and 2 of Charge II are set aside and dismissed. The findings of guilty to Specifications 1 and 2 of Charge III and Charge III are also set aside and dismissed.

We affirm only so much of the finding of guilty to Specification 1 of Charge I as finds appellant did: "between on or about 15 January 2008 and on or about 15 April 2008, conspire with Master Sergeant Patrick A. Faust and Command Sergeant Major Ofelia Webb to commit an offense under the Uniform Code of Military Justice, to wit: extortion by communicating threats with intent unlawfully to obtain something of value, and in order to effect the object of the conspiracy the said Command Sergeant Major Ofelia Webb, Master Sergeant Patrick A. Faust, and Sergeant First Class Calvin J. Davenport, Jr. communicated to Mr. Yacoub Slawah, Ms. Genon Husayn, Mr. Muayaid Sabah Sahkir, and Mr. Naduk Hameed Ghati threats to fire them from their jobs, or words to that effect, and wrongfully collected money from Mr. Yacoub Slawah, Ms. Genon Husayn, Mr. Muaqaid [sic] Sabah Sahkir, and Mr. Naduk Hameed Ghati."

We affirm only so much of the finding of guilty to Specification 2 of Charge I as finds appellant did: "between on or about 15 January 2008 and on or about 15 April 2008, conspire with Master Sergeant Patrick A Faust to commit an offense

under the Uniform Code of Military Justice, to wit: bribery by asking, accepting, and receiving, and in order to effect the object of the conspiracy, the said Master Sergeant Patrick A. Faust, being at the time the First Sergeant for B Company, 94th Brigade Support Battalion, and an agent of the Battalion Command Sergeant Major, Command Sergeant Major Ofelia Webb, and an agent of the Force Protection Noncommissioned Officer-in-Charge, Master Sergeant [sic] Calvin J. Davenport Jr., wrongfully asked from Mr. Sanar Farid Dehard, an agent of a company operating as Netgate, a contracting company engaged in the television business, the sum of $20,000 U.S. Dollars, and wrongfully accepted and received from Mr. Sanar Farid Dehard, an agent of a company operating as Netgate, a contracting company engaged in the television business, the sum of $10,000 U.S. Dollars, all with intent to have their actions influenced with respect to awarding an authorization to operate a television business on Forward Operating Base Rustamiyah, an official matter in which the United States was and is interested, to wit: the providing of television service to the Soldiers and civilians residing on Forward Operating Base Rustamiyah."

The remaining findings of guilty are AFFIRMED.

Reassessing the sentence on the basis of the above modified findings, the entire record, and in accordance with the principles of *Sales* and *Moffeit*, to include the factors identified by Judge Baker in his concurring opinion in *Moffeit*, and considering this court's finding of unreasonable post-trial delay, only so much of the sentence as provides for a bad-conduct discharge, confinement for ten months, and reduction to the grade of E-1 is AFFIRMED. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings and sentence set aside by this decision, are ordered restored. *See* UCMJ arts. 58b(c) and 75(a).

Senior Judge KERN and Judge MARTIN concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

19